477 So.2d 1161 (1985)
Rosemary BRUMFIELD,
v.
H. Alva BRUMFIELD III.
No. 84-CA-0741.
Court of Appeal of Louisiana, First Circuit.
October 8, 1985.
Rehearing Denied November 8, 1985.
Writ Denied December 20, 1985.
*1163 James W. Pierce, Baton Rouge, Michael O. Hesse, St. Francisville, for plaintiff-appellee Rosemary Brumfield.
Charles S. McCowan, Pamela C. Walker, and John Dale Powers, Baton Rouge, and Kenneth Rigby, Shreveport, for defendant appellant H. Alva Brumfield, III.
Before EDWARDS, LANIER and JOHN S. COVINGTON, JJ.
EDWARDS, Judge.
This is a suit by Rosemary Meyers Brumfield (Rosemary) against her former husband, H. Alva "Beau" Brumfield III (Beau), in which she sought to have declared null and void a marriage contract executed by them on December 19, 1968, the day before they were married. Mrs. Brumfield also prayed for other relief in her petition, resulting in a decision by this court reported in 415 So.2d 520 (La.App. 1st Cir.1982). The case presently before us concerns only the validity of the pre-nuptial agreement, other contentions between the parties having been disposed of elsewhere.
The facts and events surrounding the execution of the contract are in dispute. Beau Brumfield, an attorney, testified that the agreement was signed by Rosemary and himself on the day before their wedding, at his law office, in the presence of a notary and two witnesses. Rosemary, on the other hand, denied that it happened that way at all. She said she was ill that entire day and stayed at home, at her parents' house, in the company of family and friends. She testified that Beau and his secretary, Linda Nugent, brought the contract over for her to sign.
By Rosemary's account, Beau first presented her with the document in the living room. She asked to read it but he said no, that it was legal and she would not understand it. At that point she was "really in kind of a huff" and went to her bedroom.
Beau followed her there and they continued their conversation. Beau said the document was very important and had to be signed before they were married the next day. Rosemary again asked to read it but Beau refused, again telling her it was a legal paper and that she would not understand it. She said she would not sign, whereupon Beau said he would not marry her. At that point she angrily told him to leave the house. "... Then he started begging me to sign it. He said it was very important, that it had to be signed, that it protected our community property."
She went on to testify that Beau never referred to the paper as a marriage contract or as a contract of any sort. He said it was based on inside information that he and his father, also an attorney, had concerning the legal future of community property in Louisiana. The Supreme Court, Beau told her, was going to "knock down" the community property laws of the state, but this document had been drawn in such a way as to protect the community between the two of them regardless what the Supreme Court did. He made no further explanation. Finally, she signed the contract without reading it.
Her testimony continued to the effect that she put the incident completely out of her mind, saying nothing about it to her family or friends. Then, about seven or eight years later, she had occasion to speak with Beau's legal secretary at that time, Betty Wilkinson, about Betty's marriage contract. Betty said she had signed such a paper without knowing what it was, and had defeated it in court.
"... In listening to her conversation," Rosemary testified, "I remember telling her that I signed some kind of paper but that mine protected community property... "I remember she either said that you are crazy if that is what you think it is, or something like that.... From what she said, I got the idea that it probably wasn't what I thought it was."
By now, Rosemary testified, she was sufficiently awakened to get a draft copy of *1164 the contract she had signed and to confront Beau with it.
... I read it and the second paragraph is the one that I was concerned about. I faced Beau with it that night and said you know, this is not what you told me it was, and I understand this second paragraph clearly, and it does not say it protects our community property. He told me at that time that I still did not understand it, then he had told me that I would not understand the legal jargon or whatever, and that I would misunderstand it, and that was why he had not let me read it originally and that I still misunderstood it. The next night he came in with legal sheets of properties that were ours.
They talked about the list of properties, Beau persuading her that there was a community and that these holdings were part of it. He repeated that she had misunderstood the agreement. "We never really talked about it again, but I was really confused," she testified. "I wasn't ever  I didn't really know whether to believe him or not."
Beau finally revealed the truth to her, she said, on the day they separated in January of 1981.
The Saturday that he told me he was moving out, at the end  he had a long discussion and at the end he said, `By the way, that contract you signed says you own nothing, absolutely nothing. I have lied about it all these years and you don't so much as own the clothes on your back, so get your kids and get a job and get out of this house,' is what he said.
Rosemary's testimony concluded with this exchange:
Q. I want to know why you signed this contract without reading it.
A. I loved him and I trusted him and he was an attorney and I knew nothing about legal matters. I guess the main reason was that I loved him very much and I trusted him.
The contract in question was introduced into evidence by both sides. Defendant produced a greatly enlarged photocopy measuring three (3) feet across and two and one-half (2 ½) feet in length. It was placed upon a stand facing the jury and remained there through three days of testimony. Many of the witnesses referred to it as they answered questions.
The second paragraph, which Rosemary testified had troubled her, was clear and direct, totally free of ambiguity:
... [S]aid intended husband and wife shall be separate in property. Accordingly, they hereby formally renounce those provisions of the Revised Civil Code which establish a community of acquets and gains between husband and wife.
It was signed by R.C. Meyers III and by John Jeffries as witnesses; H. Alva Brumfield III and Rosemary Meyers; and by Sylvia Roberts, notary public.
The witnesses to the contract split their testimony, one testifying for each side. John Jeffries, an attorney who had known Beau for many years, said he signed with Rosemary and Beau at Beau's law office. Richard Meyers III, Rosemary's brother, said he signed the paper in blank, at his parents' house, with no one present other than himself and Beau Brumfield.
Sylvia Roberts, an attorney who shared space in the Brumfield law office, served as the notary public. She testified that everything had been done properly, with all parties in her presence as recited in the agreement. She testified further that she had great reverence for the duties and responsibilities of a notary and that she had never notarized anything unless the persons involved were present, signing before she did.
Rosemary testified about other matters besides the signing of the contract. She said she was sick with a fever that day and did not leave the house until evening, when she attended the wedding rehearsal and dinner afterward. She did not attend a wedding party after the dinner, however, because she was still not feeling well. Rosemary said that her illness was the result of a smallpox vaccination she had received several days before. This was in *1165 preparation for a honeymoon trip to Europe, a last-minute gift from Beau.
Corroborating testimony came from her mother and sister who said that, between them, they were at the house with Rosemary all day; from Denise Whittington, who said she greeted Beau Brumfield at the door when he arrived to bring Rosemary the contract; and from Rosemary's co-workers at her job, who verified that she had been unwell all that week.
Beau Brumfield testified that he did not go to the Meyers residence at all on the day in question. He said that he met Rosemary and her brother at the law office, by pre-arranged appointment, to sign the contract. He said Rosemary had read the contract, knew what it said and what it meant, and that she desired the protection it would offer her. He spoke at length about his own vulnerability to suit and judgment, and how the agreement would keep Rosemary safe in the event that a judgment were obtained against him which might exceed his ability to pay.
Beau said Rosemary was not sick at all that day. He said she attended the wedding rehearsal, was happy and outgoing, and drank champagne with the guests. His counsel introduced a series of photographs taken at the rehearsal dinner showing Rosemary holding a wine glass and having it refilled. Beau admitted that she did not attend the party after the dinner, but said she was full of life and that he could hardly keep up with her two days later in New York.
There was rebuttal testimony in which Rosemary said she had done no drinking at the rehearsal dinner but had stood around with a glass, posing for pictures and trying to be sociable. In addition, there was rebuttal testimony showing that in the Brumfield law practice it was not unusual for documents to be signed in blank at the office or elsewhere, and to be notarized later.
This case was tried before a jury in January, 1984. The testimony was totally irreconcilable. The jury found for the plaintiff. The court entered judgment for Rosemary, declaring the purported marriage contract null and void, thus restoring her right to community property. Defendant brought this suspensive appeal specifying eight assignments of error.

JURY'S ANSWERS TO INTERROGATORIES
At the conclusion of the trial, under the provisions of LSA-C.C.P. art. 1813, the court directed the jury to answer two written interrogatories and to return a general verdict. The submitted questions, the general verdict, and the jury's responses were as follows:
General Verdict
A. We, the jury, find for the plaintiff, Rosemary Brumfield X
or
B. We, the jury, find for the defendant, H. Alva Brumfield III, ___
Written Interrogatories
1. Do you find that the marriage contract at issue in this case was executed in authentic form before a notary and two witnesses? Yes
2. Do you find that the consent of the plaintiff to the marriage contract at issue in this case was obtained by undue influence or fraud on the part of H. Alva Brumfield III, or through error as to the principal cause of the contract induced by H. Alva Brumfield III, so as to invalidate this contract between the parties? Yes
In his first two assignments of error, defendant urges that (1) the jury's answers to the interrogatories were inconsistent and (2) that the trial court incorrectly instructed the jury concerning their responses to the interrogatories.
Regarding inconsistency, counsel for defendant argues that the jury could not logically find the contract to be authentically executed and yet induced by fraud. This is because the only evidence of fraud is in Beau's conversation with Rosemary at her parents' house. If the contract was indeed authentic, as found by the jury, then it necessarily had to be signed at Beau's law *1166 office before the notary and two witnesses. That being so, the conversation with Rosemary never took place, since Beau would not have gone to her house that day. He would have met her at his office for the signing. The validity of the signing, therefore, rules out the existence of the fraud. The existence of the fraud rules out the validity of the signing. Thus it cannot be, as the jury found, that the contract was authentic but was induced by fraud.
The conclusion, as sought by defendant, is that the answers to the interrogatories are sufficiently inconsistent that the trial court should not have entered judgment for plaintiff.
This position is not supported by the record. There are statements in the record between court and counsel, out of the jury's presence, to the effect that the jury was not fully aware of exactly what authentic form meant.
Mr. McCowan: We additionally request an additional jury instruction on the difference between the authentic act 
The Court: I thought it was improper for both sides to fail to explain to the jury that that requires somebody that saw them signing before the notary. Neither side went into that. I don't know if that was inadvertance or deliberate. I don't know what I am going to do about it.
Mr. McCowan: That is what we asked Ms. Godwin, and we made that clear, your honor.
The Court: It has never been made clear to this jury, and particularly with regard to this last witness or to the young man that testified that  somebody who saw either the buyer or seller sign must be before a notary. I am not sure that is too important.
This exchange between the court and defense counsel, with plaintiff's counsel present, took place at the close of testimony but before final arguments. No further clarification was made, other than by the court's instructions on the law. Those instructions were correct and complete, but it is possible that the jury was still not certain of the legal requirements for an authentic act. In light of this, the jury might have concluded that the contract was "authentic" because there were no forgeries. No one denied signing it. Therefore, it could be authentic in the sense of being real or genuine. This in turn could explain the appearance of contradiction in the finding.
This court, however, need not resolve the question of inconsistency on the facts. The controlling basis on which we must rule is procedural. LSA-C.C.P. art. 1793 (C) reads as follows:
A party may not assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury. (Emphasis added)
LSA-C.C.P. art. 1796 provides in part:
A. If the jury, after retiring for deliberation, desires to receive information on any point of law, they shall be conducted to the courtroom.
B. After giving notice to the parties, the court may give the appropriate instructions.
Naturally, any objection to additional instructions must be made in accordance with Article 1793 (C).
After the jury had retired to decide the case, the foreman requested additional instructions. All attorneys were summoned and the jury was brought back to the courtroom. The question was whether or not the two interrogatories were mutually exclusive. The court instructed the jury that they were not.
The Court: The plaintiff in her lawsuit has made two attacks on the document that has been introduced into evidence. One attack is claiming that it was not valid as to form. If you think that is true from the evidence, you should mark "yes", and, if that would be true, she would win. You could find "no" to the second question  "no" or "yes" to the *1167 second question about fraud. The other contention that the plaintiff has made is that the contract was induced by fraud, and, if you find "yes" for that the plaintiff would win. You could find "yes" for that and also find it was in proper form. I am not saying that is logically consistent but legally consistent. In other words, if you find "yes" as to either one of those questions, the plaintiff wins. Does anyone disagree with that? If you find "no" to both questions, the defendant wins. I am not telling you as a matter of logic or comment on the evidence that it has to be "yes" to both or "no" to both. You have to decide. (Emphasis added)
The court, by the emphasized language, invited objections. None were raised. Defendant's counsel then asked for a conference at the bench. After that, the judge repeated the same instructions, concluding with these words:
They are not mutually exclusive. There are two attacks. If she wins either one, she wins the case. That is all I can tell you.
There is jurisprudence bearing directly on this point. In Troxlair v. Illinois Central Railroad Company, 291 So.2d 797 (La.App. 4th Cir.1974), the court said at page 802:
Out of an abundance of caution we have examined the charges given by the court and the interrogatories. We note that the instructions and the interrogatories when considered together do lead to a fair consideration by the jury. As a matter of fact, the only objections raised as to unfairness were raised by the defendant, and the jury was reinstructed by the court to correct what he felt was in error. The jury requested further instructions on the question of proximate cause and the judge gave lengthy and exhaustive definitions thereof. Again only objection made was that of defendant, and plaintiffs-appellants raised no objection. The appellants, after having had ample opportunity to object, were willing to permit the jury to consider the case, and it is only now after they have received an unfavorable verdict and judgment that this error is urged as a basis for reversal. We feel under the circumstances appellants have also waived these objections and cannot now be heard to complain. See Johnson v. H. W. Parson Motors, Inc., 231 So.2d 73 (La.App. 1st Cir. 1970).
Accordingly, we rule that under LSA-C.C.P. art. 1793 (C) defendant's first two assignments of error are not properly before this court, objections to the jury instructions having been waived. We rule further that any seeming inconsistency in the jury's answers to the interrogatories will be resolved in accordance with the trial court's instructions. We conclude, therefore, that the jury could properly find the contract to be authentic in form but induced by fraud.

JURY'S FINDING OF FRAUD
Defendant contends in this third assignment of error that the trial court should have granted a motion for judgment notwithstanding the verdict, on the ground that the jury's finding of fraud is contrary to the law and the evidence.
LSA-C.C. art. 1847 defines the kind of fraud sufficient to nullify a contract.
Fraud, as applied to contract, is the cause of an error bearing on a material part of the contract, created or continued by artifice, with design to obtain some unjust advantage to the one party, or to cause an inconvenience or loss to the other.
A charge of fraud is most serious and grave. Fraud is never to be imputed to anyone except upon legal evidence which must be strong[1] and convincing, not merely *1168 probable or of a suspicious nature. Packwood v. Johnson, 264 So.2d 663 (La. App. 1st Cir.1972). Although Article 1847 is found in that portion of the Civil Code dealing with nullity of contracts resulting from defects of consent, including error, it is clear that to constitute fraud the error must be caused by fraudulent misrepresentation. Buston v. McKendrick, 64 So.2d 844, 223 La. 62 (1953); Broussard v. Fidelity Standard Life Insurance Co., 146 So.2d 292 (La.App. 3rd Cir.1962).
In the case before us, defendant contends that a review of the entire record cannot support a finding of fraud by strong and convincing evidence. This contention is not correct. Testimony is evidence. The record contains sufficient testimony for conclusive proof of fraud, assuming the testimony can be believed.
Rosemary's evidence, stated in one paragraph, is that defendant went to her home and, through persuasion and deception, obtained her signature on a contract which he did not allow her to read; that he persuaded Richard Meyers III to sign the agreement in blank, as a witness; that, in spite of his denials, he and his secretary, Linda Nugent, were seen at the Meyers home that day by Denise Whittington; that several years later he compounded his deception by showing Rosemary a list of holdings purported to be property held in community by the two of them; and that when the marriage ended in separation in 1981, he confessed that he had lied to her about the nature of the contract from the beginning.
This tapestry of deception, assuming again that it can be believed, proves fraud beyond any doubt and beyond the requirements of law. All doubts are removed and all legal standards of proof are met when a party asserts the triumph of his own duplicity. The question before us, then, is not only a matter of law and evidence, but of believability.
By its very nature, fraud has as many different styles and disguises as those who engage in it. Some kinds of fraud are more easily proved than others. In the case of commercial or industrial fraud, for instance, a team of auditors can often go in and examine books, records and inventories, and in a few hours produce tangible proof of deception. It is much different in the case of intimate fraud between lovers. Usually no one is present except the two parties, and records are quite often not kept. Yet there is no doctrine that intimate fraud cannot be successfully proved.
Since there is sufficient evidence to prove plaintiff's case, the question is whether it can be believed. There is an ancient principle in our law that it is the peculiar province of a jury to pass on the credibility of witnesses. A verdict will not be disturbed on questions of fact involving the credibility of witnesses unless that verdict is manifestly erroneous. Selser v. Revol, 152 La. 447, 93 So. 675 (1922); Continental Bank & Trust Co. v. Sacks, 152 La. 97, 92 So. 747 (1922); Moret v. New Orleans Rys. Co., 112 La. 863, 36 So. 759 (1904).
In Hardie v. Allen, 50 So.2d 74 (Orleans App.1951), the court said at page 76:
The law requires exceptionally strong proof to sustain a charge of fraud.... But upon questions of fraud in fact, an appellate court will be reluctant to interfere with the verdict of the jury, and it seems that more deference will be paid to verdicts on questions of fraud than to verdicts on other questions of fact. (citations omitted)
This principle has endured because it is based on the jury's advantage in hearing and seeing the testimony firsthand. They observe the demeanor of witnesses and hear the nuances of voice. These things must be respected on appeal since they cannot be shown in a written record.
Was the jury's verdict manifestly erroneous? A finding that the defendant *1169 went to the Meyers residence on the day in question is certainly not unreasonable. There is testimony by Rosemary and two witnesses placing him there. Although there were no witnesses to the private conversation regarding the contract, evidence of Beau's presence there, at all, is most damaging to his case. A major part of his defense was that he did not go to the Meyers home for any reason that day. His counsel produced testimony tending to show that he was elsewhere at the hour in question. Thus a finding that he visited Rosemary is also a finding that he went there to obtain her signature. Although thoughtful people may differ with this line of reasoning, it is supported by the evidence and it cannot be called "manifestly erroneous."
The legal standard to be applied when reviewing a jury's findings is set out in Gardner v. Allstate Insurance Company, 422 So.2d 1380 (La.App. 1st Cir.1982):
The record of the proceeding must reveal a reasonable factual basis for the finding of the trial court, and a further determination that the finding is not clearly wrong.
The jury's verdict in the case at bar meets this test in spite of conflicting testimony. Defense counsel writes extensively in his brief concerning the irreconcilability of the testimony, urging that the jury's verdict is unsupported. It is true that the two sides had conflicting versions of the facts, but this does not mean the verdict is legally flawed.
Even though appellant has shown conflicting testimony as to each of these findings, it is not proper to substitute our judgment ... when there is a reasonable factual basis in the record supporting such a finding and the finding is not clearly wrong. As was stated in Martin v. Feiber, 357 So.2d 5 (La.App. 1st Cir. 1977), "[A]ppellate courts must accord great weight to the factual findings of the trier of fact. When testimony is in conflict, reasonable evaluations of credibility and reasonable inferences of fact drawn by the trier of fact should not be disturbed on appeal...." The valuations of credibility in this case are supported by reasonable evidence. Dundy v. Louisiana State University, 394 So.2d 650 (La.App. 1st Cir.1980).
We conclude that plaintiff successfully carried the burden of proof required for a case of fraud and that the jury's verdict is supported by the evidence. Defendant's third assignment of error is without merit.

REBUTTAL ARGUMENT BY PLAINTIFF'S COUNSEL
In his closing argument, counsel for plaintiff remarked to the jury that "a lawyer with a breifcase can steal more money than a thousand armies with guns." He went on to say, "... It is true because you are armed with very dangerous knowledge as to how the system works and how things go and how things can be done." He added, "... A lot of times it is done in such a way that that person being taken advantage of doesn't even know anything. He goes away and thinks everything is okay and doesn't even realize it. I think in this case, quite sincerely, that Beau Brumfield took advantage of Rosemary." Defense counsel argues that these remarks were intended to invoke a class prejudice and to "taint" his client.
The jury in this case deliberated for seven hours. They had only two questions to answer and a general verdict to decide. It is not reasonable to assume they were stampeded to a favorable verdict for plaintiff on the strength of the quoted statement concerning armies and guns. Nor is it likely that they were successfully persuaded to regard all lawyers as devious crooks. More importantly, however, counsel raised no objection to the remarks at the time they were made. This constitutes a waiver of the right to complain of them on appeal. Luquette v. Bouillion, 184 So.2d 766 (La.App. 3rd Cir.1966).
Later in the same closing argument, plaintiff's counsel held up a sheaf of papers to the jury, saying, "I have in my hand legal documents that came out of the court house *1170 downstairs. Do you know whose names are on these things? Yours. All your names. These are your legal documents. All these documents are yours." His point was that people often sign technical legal papers without reading them, in many cases because the language cannot be understood by laymen.
At that time the defense objected that the documents were not in evidence and that it was improper to argue to individual jurors. The court sustained the objection and told the jury that, indeed, these papers were not evidence in the trial. Plaintiff's attorney, nonetheless, continued referring to the documents, addressing one of the jurors by name.
The jury then retired to decide the case. After only a few minutes they were brought back to the courtroom. The judge instructed them that it was improper for counsel to address a juror personally, and that he had admonished plaintiff's counsel for his conduct.
Defendant contends that all of this, taken together, was sufficient to prejudice the jury and that he is therefore entitled to a new trial. He filed a timely motion for new trial after the jury brought in its verdict. The motion was denied.
In Temple v. Liberty Mutual Insurance Co., 330 So.2d 891 (La.1976), our Supreme Court confronted a situation very much like the one before us. The Court said:
Moreover, counsel has great latitude in argument before a jury, subject, however, to regulation and control by the court, whose duty it is to confine argument within proper bounds. The trial judge denied defendants' motion for a new trial, which alleged, inter alia, that the prejudicial argument of plaintiffs' counsel warranted the granting of a new trial. The trial judge is in a better position than an appellate court to determine possible prejudicial effects resulting from counsel's argument before a jury. Therefore, his finding that counsel for plaintiffs' argument was not so prejudicial as to warrant the granting of a new trial should be accorded much weight. (Emphasis added)
A reading of the record plainly indicates the trial judge's awareness that this was a highly emotional lawsuit. He took adequate corrective measures to counteract the effect of counsel's argument to the jury. In light of the measures taken and the weight to be given his denial of the motion for new trial, we find no abuse of discretion by the judge. Consequently, no new trial is warranted.

OTHER CONTENTIONS BY DEFENDANT
Jury Improperly Constituted  Defendant urges that the presence of an illiterate on the jury is ground for a new trial. However, during oral argument regarding a possible continuance, defense counsel spoke as follows:
Mr. Powers: We have a jury trial here and have a jury with which we are very satisfied. If we ask for a continuance at this point, are we going to continue it until next month and come back and have this same jury so we can depose this lady.... (Emphasis added)
The defense was "very satisfied" with a panel which included a gentleman who could neither read nor write, until the jury returned an unfavorable verdict. Now, for purposes of appeal, yesterday's satisfactory jury has today's fatal flaw.
It is neither fair nor reasonable for a party to proceed to trial while holding in reserve an option to throw out the entire result if it is not to his liking. Accordingly, we find that the objection has been waived; defendant cannot now be heard to complain of it.
Although waiver is decisive of the issue, this assignment of error fails on still other grounds. See State v. Baxter, 357 So.2d 271 (La.1978), which says that the burden is on the objecting party to show that the juror's lack of qualification was unknown to him at the time of trial and that it could not have been ascertained by due diligence. No such proof is offered *1171 here. On the contrary, it is clear that defendant knew all the relevant facts when the jury was selected.
Exception of Prescription  Defendant contends that this suit was filed later than the time allowed by law and that, consequently, it should have been dismissed by the trial court. LSA-R.S. 9:291 was amended to allow spouses to sue each other during marriage for "causes of action arising out of a contract," effective January 1, 1980. The present suit was filed on June 4, 1981. Article 2221 of the Louisiana Civil Code provides that suits on contracts may be brought within ten years. Plaintiff's time began to run on January 1, 1980, and she filed eighteen months later. Since this was well within the ten-year period, the suit was timely. This assignment of error is without merit.
Witnesses Not Listed In the Pretrial Order  The Court allowed several witnesses to testify who were not listed in the pre-trial order. Three of them, E. James Dominguez, E. James Dominguez, Jr., and Merlene Dominguez testified in rebuttal. The rule of court is that rebuttal witnesses need not be included. Defense counsel argues in his brief that their testimony was improper because they were not listed in the pre-trial order, but at trial he said, "If it is for rebuttal, your honor, we don't have any problem with it not being listed." The objection to this testimony was thereby waived.
The trial judge then invoked LSA-C.C.P. art. 1551, which allowed him to modify the pre-trial order, and permitted testimony by Madeline Needles (Rosemary's sister) and two others. Defense counsel contends that the court abused its discretion in applying article 1551. Counsel does not, however, assert that his client was surprised, prejudiced, or damaged in any way. Regarding Mrs. Needles, the defense brief says only that "She did not testify about the substance of any conversation." The other two witnesses are not mentioned at all. This assignment of error states no grounds for relief and is therefore without merit.
Defendant's Notarial Practices  Plaintiff presented on rebuttal the testimony of several witnesses concerning the execution of notarial documents in defendant's law office. The thrust of the testimony was that it was not unknown for that office to take shortcuts in notarizing various papers. Defendant claims this testimony was irrelevant. We, however, cannot agree. One of plaintiff's primary attacks on the contract was that it was improperly executed. The defense offered testimony to show that all legal procedures were properly followed. It can hardly be irrelevant to show on rebuttal that there were numerous instances in that office in which regular notarial procedures were not properly followed.
Costs of this litigation are to be paid by defendant.
AFFIRMED.
NOTES
[1] Packwood holds that the burden of proof in fraud cases is strong and convincing evidence. The jurisprudence has now standardized this burden as clear and convincing. This is an intermediate standard of proof. It is less stringent than the rule in criminal cases which requires proof beyond a reasonable doubt, and yet more demanding than the traditional measure of persuasion in civil cases which requires a preponderance of the evidence. To be clear and convincing, the existence of the disputed fact must be highly probable, much more probable than its non-existence. Succession of Lyons, 452 So.2d 1161 (La.1984).