316 So.2d 783 (1975)
Mrs. Patsy W. TEMPLE, Individually, etc., et al.
v.
LIBERTY MUTUAL INSURANCE COMPANY et al.
No. 10290.
Court of Appeal of Louisiana, First Circuit.
June 30, 1975.
Rehearing Denied August 26, 1975.
Writs Granted October 17, 1975.
*785 Robert J. Vandaworker, Baton Rouge, for appellants.
W. P. Macmurdo, and Arthur B. Haack, Baton Rouge, for plaintiffs-appellees.
Before LANDRY, BLANCHE and YELVERTON, JJ.
LANDRY, Judge.
Defendants, Liberty Mutual Insurance Company (Liberty), The Electric Delivery System (Electric), and George A. Kuntz (Kuntz) (Appellants), appeal a jury award judgment in favor of Plaintiffs, Patsy W. Temple, individually, and as tutrix of the minors, Kim Renee Temple and Kerri Lynne Temple, and Forrest Keith Temple, individually (Appellees), in the aggregate of $741,000.00, as damages for the death of Billy Ray Temple (deceased), husband of Patsy W. Temple and father of the remaining Appellees. The decedent met his death in an automobile accident in which a vehicle being driven by decedent was struck from the rear by a truck owned by Electric and being driven by Electric's employee, Kuntz, who was transporting a load of Times Picayune newspapers from New Orleans to Baton Rouge, Louisiana. Liberty is Electric's liability insurer. We affirm the finding of Appellants' liability, but reverse the award of damages because of highly prejudicial and inflammatory remarks by Appellees' counsel in his argument before the Jury, and remand to the trial court for a new trial on the question of quantum only.
Mrs. Temple was awarded an unitemized judgment of $406,500.00. Each of decedent's three children were granted a non-particularized recovery of $111,500.00. Forrest Keith Temple was 17 years of age when suit was filed and a major when judgment was rendered in his favor. Kim Renee Temple and Kerri Lynne Temple, daughters of decedent, were 16 and 14 years of age, respectively, on the date of judgment.
Appellants urge four basic errors, namely: (1) Appellants are not liable; (2) alleged prejudicial argument by counsel for Appellees justifies reversal or new trial; (3) the trial court committed alleged errors which warrant reversal or new trial, and; (4) the reputedly inordinate jury awards are per se ground for reversal or new trial.

*786 LIABILITY
The accident occurred between 12:30 A. M. and 12:45 A. M., February 28, 1974, in the outside northbound lane of U. S. 61 (Airline Highway) at a point approximately 1.3 miles north of the junction of Airline Highway with La. Highway 42 (Highland Road), East Baton Rouge Parish. At the scene the highway consists of four lanes, two for northbound and two for southbound traffic. The opposing lanes are separated by a neutral ground approximately 30 feet in width. Decedent was driving a white, 1962 Dodge four door sedan. Kuntz, acting within the scope and during the course of his employment by Electric, was driving a 1972 Chevrolet truck which weighed in excess of 14,000 pounds, including its cargo of newspapers. The Dodge weighed about 3000 pounds. At the scene of the accident the roadway was straight and level and its surface was dry. The night was clear. There was no obstruction or impairment of vision. The impact occurred in the right or outside northbound lane of travel, near the lighted parking lot of a business establishment (lounge), situated on the east side of the highway. There were no lights on the opposite side of the highway. The posted speed limit was 55 miles per hour.
Appellants maintain that the Temple vehicle was without lights and/or stopped on the highway at the time of the collision. Appellees contend the Temple vehicle displayed proper lights and was moving when it was struck from the rear. As will hereinafter appear, considerable evidence was offered concerning these adverse contentions.
Kuntz concedes he was traveling at 55 miles per hour and that his vision was unimpaired in that there were no vehicles approaching in the southbound lanes.
Much testimony was offered by both sides concerning the occurrence of an accident in the southbound lanes at a point about 1/10 of a mile from the accident in question. The other incident involved a collision between a passenger bus and a horse and the subsequent striking of the bus by a tractor-trailer. The time relationship between the two incidents is not shown with clarity. Appellees contend the other accident happened after subject mishap. There is some evidence, however, that said other accident happened before this one. Appellees sought to show that Kuntz was distracted either by the horse or the commotion incident to the other accident, and for this reason failed to see the Temple vehicle. We conclude the time relationship to said other accident is of no moment in deciding the instant case.
Kuntz testified the Temple vehicle was stopped on the highway without lights. He stated he was constantly looking ahead; that he was unaware of any other accident in the vicinity, and that he did not see the Temple vehicle until immediately before the impact, at which time the Temple car was only two or three feet away. He saw no lights or reflectors on the Temple car. He admitted he did not apply his brakes before the impact and was not certain whether he applied his brakes afterward. He noted that he instinctively swerved to the left upon seeing the other car. After the impact he veered back to his right to avoid crossing the neutral ground. His vehicle came to rest in the parking lot of the lounge adjacent to the highway.
The investigating officers testified there were no skid marks left at the accident scene. The physical evidence preponderates against the conclusion that Kuntz swerved to the left before the impact. Gouge marks left on the highway surface commencing at the point of collision, run straight ahead, parallel to the highway, a distance of 35 feet, at which point they made a gradual arc to the right for about 85 feet and then left the highway. Kuntz's truck came to rest in the lounge parking lot 110 feet from where it left the highway. The Temple vehicle stopped in the lounge *787 lot 85 feet from where it exited the roadway. Upon coming to rest, the two vehicles were parallel to each other and only about 4 feet apart. It is undisputed that the front of the truck penetrated the Temple vehicle as far as the back of the rear seat, or about 6 feet. It is also conceded that the truck overrode the Dodge car and that the vehicles proceeded down the highway in tandem following the impact. The force of the collision demolished the rear of the Dodge. The gas tank of the Dodge was separated from the vehicle. The tank was found in the parking lot approximately 100 feet south of point where the automobile came to rest.
Appellants produced Alvin Doyle who conducted a detailed examination of the Temple vehicle and concluded that its rear lights were not burning at the time of the accident. Within a day or two of the accident, Doyle examined the Temple car in a wrecker lot to which the vehicle had been taken. Without permission from the Temples, Doyle removed the left tail light assembly. From the trunk of the car he removed a 51-inch section of electrical wiring known as the tail light wiring harness which consists of three wires and assorted terminals designed to supply electrical current to the rear tail lights, including the running lights, turn signals, stop lights and also the rear license plate light. Doyle found a break in the wire which supplies current to the left rear tail light. This defect was noted at the point where the wire, in place, was originally bent 180 degrees to pass under the clamp which holds the harness in place in the trunk of the vehicle. The break was through the metal conductor and through the insulation on one side only. It was not a complete break. Doyle found the right rear tail light assembly missing but found the right tail light socket terminal present and also removed that item. Doyle's investigation disclosed no tail light bulbs or remnants thereof. Tests made by Doyle on the broken harness wire, disclosed that the wire would not conduct current because of the break. Doyle also noted that the left tail light socket and terminals were so corroded and encrusted with foreign material that there could not have been a bulb in this assembly and if a bulb had been present it would not have burned. On these findings, Doyle concluded the left rear tail light was not burning at the time of the accident. Doyle also explained that the socket assemblies on the Dodge are spring loaded and that rotation is required to either insert or remove a bulb. Because of this method of construction, Doyle seriously doubted that the impact of the accident could have dislodged a bulb, and also that if a bulb had been in the socket its base would have remained. This latter premise was relied upon by Doyle in support of his conclusion that there was no bulb in the left tail light socket at the time of the accident. As to the right tail light, Doyle testified that the terminals he found were so corroded they would not conduct an electrical charge and in the absence of a socket and bulb, there could have been no tail light burning on the right side of the Temple car.
Dr. Tonn, a consulting engineer, and expert in automobile accident reconstruction, in essence agreed with Doyle's analysis of the lights on the Temple car. Tonn's conclusion in this regard was based upon photos taken by Doyle of the parts removed from the Temple car, his examination of the wiring harness which Doyle removed, and his inspection of the vehicle. Also based on examination of photos of the vehicles involved in the accident, the accident scene itself (four months after the accident) and other pertinent data, Tonn concluded the Temple vehicle was stopped at the moment of impact. He so found on the basis of the paths taken by the vehicles, which led him to believe the truck pushed the automobile along the highway. He also found that the relatively long marks left by the rear tires of the Temple car indicated the vehicle was stopped when struck. Tonn explained that a moving vehicle would leave only a short set of marks *788 because the wheels being in rotation would readily catch up with the accelerated motion of the vehicle produced by a blow from the rear, whereas a stopped vehicle would take longer for its wheels to rotate and would thus leave longer tire marks. In addition, Tonn stated that a vehicle in motion would have a tendency to pivot, or turn, sooner than did the Temple car which traveled ahead over 100 feet before leaving the highway. Tonn also stated that the force of the blow shoved the engine of the Temple car forward into the radiator. He noted the imprint of the fan on the radiator and deemed the nature of the damage to the radiator to be indicative of contact between fan and radiator with the fan idle. Finally, Tonn considered the degree of penetration of the car by the truck and the distortion of the car's unitized body, to be indicative of the fact that the car was stopped at the moment of impact.
Appellees produced Dr. Olin K. Dart, professor of Civil Engineering and Dr. Leonard C. Adams, Electrical Engineer, who checked the Temple vehicle and the accident scene on March 9, 1974. They took numerous photographs of the vehicle. They noted the removal of the left rear tail light assembly and the wiring harness taken off by Doyle. Contrary to Doyle's finding, Drs. Dart and Adams found the right tail light assembly on the vehicle. The remaining lighting system on the car was noted to be operable. They found the license plate light of the Temple car on the vehicle's bumper with the bulb intact, but noted that the bulb was accidentally broken when they removed the light from the bumper to which it was attached. Because the bulb was broken, they could not test it. In the wheel well of the trunk of the Temple car, Dart and Adams found the base of a bulb of the type used in tail lights of many vehicles, including the Temple car. A microscopic examination of the light base conducted by Dr. Adams indicated the bulb was burning when it was broken. Dr. Adams theorized there was a high probability this bulb was broken in the accident in question. Drs. Dart and Adams also removed the right tail light assembly they found on the Temple car. They noted a remnant of a red plastic reflectorized light was attached thereto. Dr. Adams was subsequently given the items removed from the Temple vehicle by Mr. Doyle. Using an ohmmeter, Dr. Adams made an electrical conductivity test of the left tail light. The test showed a bulb would burn in the socket. He then inserted a bulb in the socket, energized the system with electricity and the bulb burned. Using the same procedure, he tested the right tail light assembly he removed from the Temple car and found that a bulb would burn in that assembly also.
In rebuttal, Mr. Doyle indicated that the right tail light assembly produced by Dr. Adams did not come from the Temple car. In this regard, we believe Mr. Doyle to be mistaken. Photographs which Doyle himself took of the Temple car on March 1, 1974, indicate the presence of a right tail light on the vehicle.
The condition of the lighting system on the Temple car was also attested to by two lay witnesses, namely, decedent's son, Forrest Keith Temple, and James H. Nunnery, who sold the Dodge to decedent about three months before the accident. Mr. Nunnery stated the vehicle's entire electrical system was in good working order when he sold the car to decedent. Mr. Forrest Temple testified that the lights on the Dodge were all in good working order; that he had helped his father work on the car's lights the weekend before the accident; and, that he had replaced a light bulb in the rear tail light on this occasion.
Mr. Thomas Tyler, a patron in the lounge near which the accident happened, was attracted to the scene by the noise of the impact. He was one of the first persons to view the vehicles after the accident. He went out to the parking lot where the vehicles were at rest and observed the right front parking light of the Temple *789 car burning. Later, when the police arrived, the light switch of the Temple car was found to be in the "off" position.
Despite Kuntz's testimony to the effect he saw no lights on the Temple car, we find the evidence preponderates in favor of the conclusion that the lights on the Temple car, including the tail lights, were burning at the time of the accident. For all practical purposes, Kuntz admitted he did not see the car at all before the impact. Assuming he saw the car when two or three feet away, as he testified at one point, we doubt seriously his ability under these circumstances to determine whether the lights on the car were burning or not.
Based upon extensive examination of the two vehicles, the scene of the accident and the nature of the damage involved, Dr. Dart concluded the Temple vehicle was in motion when struck and that the speed differential between the car and truck was approximately 10 to 20 miles per hour. Based on the marks left at the scene, Dr. Dart concluded that Kuntz did not swerve the truck but that the truck was virtually parallel to the highway at the moment of impact. He found that the right front of the truck entered the Temple car, overrode the rear bumper of the car, causing the left rear tire of the car to blow out. Dr. Dart also noted that the force of the blow caused the automobile to rotate to the right because the main thrust of the impact was to the left rear of the Dodge. He concluded the speeds of the vehicles were equalized following impact, which fact caused the vehicles to track along together for about 75 feet before they separated. Dr. Dart was of the view that if the truck was proceeding at 55 miles per hour, the Temple car was traveling at 35 to 40 miles per hour when the collision occurred.
From the masses of evidence herein, we find that the Temple car was adequately lighted and moving upon the highway. We likewise conclude that Kuntz's testimony itself convicts him of negligence in failing to see the Temple vehicle in time to avoid striking it from the rear. We further conclude that Kuntz's negligence in this regard was the sole proximate cause of the accident. We find no negligence on the part of decedent, Temple.
Assuming, solely, for argument's sake, that decedent, Temple, was negligent in stopping either a lighted or unlighted vehicle upon the highway, we find Kuntz liable under the doctrine of last clear chance. The record shows that the Temple vehicle was white in color and that at least one of its tail lights was equipped with a reflectorized lens. The highway was level and straight; the night was clear; Kuntz's visability was unimpaired. Dr. Tonn's testimony shows that under the circumstances the Temple vehicle, even without lights, was visible from a distance of 400 to 600 feet. Had Kuntz been keeping a proper lookout, there appears no reason why he should not have seen the Temple car in time to take evasive action. Having failed to avail himself of the last clear chance to avoid the accident, Kuntz is liable to plaintiffs herein.
We find the doctrine of last clear chance applicable herein, although it was not expressly pleaded by Appellees. Defendant alleged contributory negligence on Temple's part and introduced evidence in support of this contention. Plaintiffs countered with evidence intended to refute the charge of contributory negligence. Under our procedural rules, a defense of contributory negligence is presumed denied as a matter of law since no replication is permitted by plaintiff. LSA-C.C.P. art. 852. Last clear chance need not be expressly pleaded by plaintiff in offset of defendant's plea of contributory negligence. Dean v. Orgeron, La.App., 195 So.2d 150. Moreover, our procedural rules provide that an appellate court may render any judgment which is just, legal and proper on the record, irrespective of whether a particular legal point or theory is made, argued, or passed upon by the trial court. LSA-C.C.P. art. 2164; Ohanna v. Ohanna, La. *790 App., 129 So.2d 249. We also note that, in this instance, the trial court correctly instructed the jury concerning the law of last clear chance.

DAMAGES
Appellants contend inordinately high damage awards were made in this instance because of certain alleged errors on the part of the trial court and repeated inflammatory appeals to prejudice made by counsel for Appellees in argument before the jury.
It is first contended the trial court erred in giving the following alleged abstract instruction regarding plaintiffs' right to recover for decedent's pain and suffering:
"As to Mrs. Temple, the widow, you must consider * * * the physical pain and suffering, if any, experienced by her husband between the time of the accident and his death;
As to each of the three children * * * you must consider * * * the physical pain and suffering, if any, experienced by the father between the time of his accident and his death. In this latter regard, I instruct you that should you find that the decedent did in fact experience pain and suffering you are to award one-fourth of any monetary value placed thereon to each of the plaintiffs herein."
Appellants maintain the foregoing charge was objectionable as abstract, inasmuch as the record reveals lack of evidence of conscious pain and suffering experienced by decedent following the accident. We find the evidence shows that decedent was alive for an undetermined period following the accident. However, our jurisprudence holds that to recover for the pain and suffering of a deceased person, it must be shown that the decedent consciously experienced pain, Addison v. Travelers Insurance Company, La.App., 281 So.2d 805. The trial court should have instructed the jury accordingly, and failure to do so was error. We likewise find that this error was significant in this instance and could quite easily have improperly influenced the jury in making its awards for damages.
Appellants also urge as error, alleged prejudicial argument by counsel for Appellees to the effect that defendants were unfair in refusing to settle plaintiffs' claims before trial and in attempting to take advantage of plaintiffs. Error is also alleged on the part of the trial court in failing to render corrective instructions to the jury to offset the effect of the alleged prejudicial argument, and also in failing to grant Appellants' application for new trial based on these reputed errors.
Our examination of the record discloses the following oral argument on the part of counsel for Appellees:
"Gentlemen, I have so much to say I just dont' know where to start. I have been practicing law for twenty-six years. I have represented insurance companies; I have been on both sides. I know how they both operate. Mr. Vandaworker asked that you all do justice to both sides. That's exactly what we want you gentlemen to do. He said don't let sympathy rule you and that's what we want to do because if anybody needs sympathy in this case, it's not Mrs. Temple, it's not her children, it's the cruel, heartless, shoddy, shameful, disgusting way that the insurance company has treated this lady ever since this accident happened. Now, we have no desire to come down here and put the lady and the children through what you all heard about the horrible details of the death. They forced us to do it. If we don't get it in the record and it's appealed, we may not get our award held up. We have to do that. But they don't care about forcing us to do that. They know that they have no defense in this case from the beginning. It's the most defenseless case that I ever saw in my life.
* * * * * *

*791 The insurance company is too smart; they have been through too many cases. They know that this is a terrible, terrible case to defend. Why are they doing it? That's what gets me. I don't know why. They are trying to feel it out, beat the children down, make them worry more, get them so that they get riled up and upset and everything that they say, "Ah just the Hell with it all; give us what you want and get out." They don't even offer that.
* * * * * *
Well, I don't know very much about cars but if that car sits out at that wrecker yard all that time and they find out there wasn't no gas in the carburetor day before yesterday, I don't think it proves a damn thing - - - pardon the expression.
* * * * * *
They just those people just don't know what they are talking about and this here we have we have a man who is dead. We have a man who is not here to say what happened. They know that. They take an unfair advantage of that and they took the most unfair advantage of anything I have ever seen. Mr. Doyle just doesn't even know what the heck he is talking about; he will just say anything. That was obvious from his testimony; I don't have to go into details on it with you all.
Dr. Tonn probably is not as bad as Mr. Doyle but he doesn't even bother to look into the evidence to see the gouge marks, to see what Dr. Adams had. If he wanted to make a fair study of this thing, he could do much better than that. He comes over from Houston, may have a cocktail with Alvin Doyle, and it's "Well, hum, let me see," and "stopped." And he knows the insurance company wants it stopped. I don't know whether he's called a I don't want to use any bad words with someone but It's like a professional you know what; they make their living with the insurance companies; they will do anything they can for the insurance company. Dr. Adams and Dr. Dart are two fine professionals at L.S.U. They don't have to do this. They like it as a hobby and they make a little money off it, you know. But that's not their interest in that, and thank God we have them here because the insurance companies haven't got them tied up.
* * * * * *
We tried to get more in the record but objections, objections, objections, objections you remember? Mr. Vandaworker won the objection battle about two hundred to three; I didn't keep account but it must have been that. That's all right, he was representing his client. That's all he can do. But I wouldn't represent them for all the money in the world.
You know, I was trying to think in a case like this something similar to what it is. Its when you read about women being raped, they are raped; they are the victims. They are afraid to go to court because they ain't going to try the fellow who raped them; they are going to try the woman. Mrs. Temple, she has her worries about coming to court and all that.
* * * * * *
They have to overcome presumption; first, the presumption that they ran into the rear of it; and second, the presumption that the love of life, self preservation, which Mr. Temple would not ever do such a thing. We looked into his life; we challenged them to look into it; we were open about it. They didn't do anything. They didn't call one lay witness. They didn't call anyone to say that Mr. Temple's lights were out before the car stopped running or anything like that. They just came down here, knowing they have not got any case whatsoever. Now, I don't really blame the insurance companies and I think they should do it; if you've got someone trying to take advantage of an insurance company with an illegitimate *792 claim, malingering as to the injury, and he's making up falsehoods maybe as to how the accident happened, and the company spent some money fighting to cut that out. But, my God, there can't be any malingering in this case; there can't be any staging of an accident. Yet, as I said before, it was just cruel and inhuman and heartless what they put this lady through. She a quotation I wrote down; I think it applies to Mr. Kuntz; I think it applies to Liberty Mutual. `He steals my purse steals trash, but he that filches from me my good name . . . `this is Billy Temple's good name '. . . robs me of that which not enriches him and makes me poor indeed.' Find Billy Temple free of any negligence. Ease her mind; clear his name.
To get damages which are the only issue in this case and it always was; they knew it all the time. They come down here and they are taking up your time and everybody else's time and they don't much give a damn who suffers by it. They don't bother me. They've got a right to do it but it does affect my client.
This, I have already touched on, grief, mental anguish and distress of the survivors because of the death of their husband. This is the claim which has been magnified and multiplied by the action of this insurance company. They have sent them, those people especially the widow through holy Hell, worrying about this case, coming down here and having to go through it all over again.
Aside from the fact that it was the second husband she lost, she gets a call in the middle of the night; she knows something has already happened. She doesn't know what it is but the police call her. She has to go the hospital  you all heard that and wait around and nobody will tell her anything. In the meantime, the insurance company who is supposed to be equal in this case, its probably on the job taking steps. They are getting facts while they are hot, before the body is cold. They can't even come up with anything. They were out there taking unauthorized use; you can get six months for it.
* * * * * *
Now, a little saying I thought of and then I'm going to close. Thank you for your attention. I don't know whether this is quite in line or not, but it says `millions for defense but not a cent for tribute.' Well, I'll have to change that because that was said during the revolutionary war. But as far as the insurance company is concerned, their attitude in a case of this kind is they should be out trying to take care of instead of trying to fight this way. Their thing is `millions for defense but not one damn cent for just and fair compensation.' That's the attitude I see them take.
So, I say, gentlemen, give them a million, one of those millions they spent for defense. I don't know what is going on in the other parts of the country but I know that if they should happen to beat some widow and kids out of some money on a case like this because of the inexperience of their attorneys' because he doesn't know how they operate, he doesn't know all the ins and outs of the law, I don't know I know it's possible that it could be done. The thought is just appalling to me that they are able to come up in the courtroom with a straight face to you gentlemen and say that they have a defense in this case. They are just, as far as I'm concerned, using you, trying to beat down (objection)
* * * * * *
Well, gentlemen, it's true I don't want to do that. There is no rule in Louisiana for punitive damages. Other states might have it. Punitive damages means damage to punish, set an example for other people. You can't give that. I say this, though, that because of pain *793 and mental anguish and what they have been put through, you've got enough grounds here."
Although many of the foregoing statements were not objected to by counsel for Appellants, the record shows that objection was entered on at least two occasions.
There appears to be little jurisprudence of our own courts on the question of the propriety of argument in civil jury cases. This paucity undoubtedly results from our constitutional mandate of appellate review of both facts and law. See La.Const.1921, Article VII, Section 29, also La.Const. 1974, Article V, Section 10(B).
We note, however, that in Luquette v. Bouillion, La.App., 184 So.2d 766, it was declared that the propriety of argument in a civil jury case must be determined in the light of the facts of the particular matter, the conduct and atmosphere of that particular trial and the arguments of opposing counsel. Citing numerous common law decisions and 88 C.J.S. Trial § 169 and 5 C.J.S. Appeal and Error § 1554, the court in Luquette, above, held great latitude is allowed in argument before a civil jury subject to regulation by the court whose duty it is to confine argument within proper bounds. Luquette also holds that unless the contrary is shown, rulings of a trial court relative to alleged improper argument are presumed to have been within the court's discretion in such matters. We agree with these pronouncements.
We amplify the foregoing by citing with approval the majority rule concerning inflammatory argument in a civil jury trial, as set forth in 88 C.J.S. Verbo Trial § 187, pp. 371-373:
"Inflammatory remarks made by counsel in argument which are calculated to appeal to the passions and prejudices of a jury are improper.
The parties to an action are entitled to a fair trial on the merits of the case, uninfluenced by appeals to passion or prejudice, and counsel should confine his argument to the evidence in the case and to the inferences properly to be drawn therefrom, and should avoid appealing to the prejudice of the jury. Arguments and comments by counsel calculated to arouse the passions and prejudices of a jury by presenting to them considerations extraneous to the evidence are highly improper. The test of whether argument of counsel is prejudicial or inflammatory is whether such comment is unreasonable or unfair in the eyes of the law. When the language used is such as discloses a studied purpose to arouse the prejudices of the jury based on facts not in the case, the court cannot overlook it or consider that a party against whom such effort has been made has had a fair consideration of his case at the hands of the jury."
With respect to appeals to prejudice and sympathy in argument before a civil jury, we approvingly quote the following rule as stated in 88 C.J.S. Verbo Trial § 191, p. 375:
"Appeals to sympathy, as long as they are based on the facts in the case, are not ordinarily considered improper and furnish no ground for complaint, and some flights of eloquence, and the introduction of some touches of pathos in the discussion of the case, are allowable, provided there is no violation of the rule against discussion of facts not in evidence, or which are not inferable from the sworn testimony in the case. However, appeals to sympathy based on matters not in evidence and which cannot in any legitimate way be brought to the attention of the jury are highly improper."
Our review of the record discloses that numerous arguments made by counsel for Appellees, as hereinabove set forth, were totally unrelated to the evidence and are without evidentiary foundation. Granted that Doyle's removal of part of the Temple vehicle shortly after the accident, was unauthorized *794 and highly unprofessional, nevertheless, it does not warrant the inferences which counsel attributed thereto in argument.
We find that the foregoing excerpts from the argument of Appellees' counsel per se show a raw, blatant and absolutely unfounded appeal to prejudice and sympathy. We note that the trial court's instructions admonished the jury in general terms not to base its decision either as to liability or damages upon sympathy, bias or prejudice. However, under the circumstances of this case, we deem such instruction inadequate to insure Appellants a fair and unbiased jury determination of damages. Insofar as liability is concerned, we find that, irrespective of the argument, the facts established are such that the jury could dispassionately find liability herein either on the ground that Kuntz alone was at fault or that Kuntz failed to exercise the last clear chance to avoid the accident.
As regards damages, however, the argument of counsel for plaintiffs in effect urged assessment of punitive damages and exhorted the jury to make the defendant insurer pay dearly for refusing to compromise the case, thereby compounding plaintiffs' mental suffering. Additionally, the argument clearly conveyed the impression to the jury that a rich and powerful insurance company had undue advantage of plaintiffs who lacked the means and ability to cope on equal terms. We deem such argument so biased, prejudicial and inflammatory as to require, in the ends of justice, a reversal of the awards of damages. The nature of the argument was such that it is highly improbable that any instruction or caution from the court to the jury could have eliminated its harmful effect from the minds of the jurors. The picture of defendant insurer and its position and actions in this matter, as painted by counsel for Appellant, was reasonably calculated to move the jury to damage awards in excess of those the jury might otherwise have granted in the absence of such prejudicial and ebullient argument. We are of the view that a civil jury can properly perform its function of damages assessment when it weighs the facts of a case in the light of proper argument which allows the finder of fact the opportunity to reach its decisions dispassionately and with due regard for the rights of all concerned.
We note also the repeated use of the mildly profane words "damn" and "Hell" in the argument of Appellants' counsel. We find such language completely out of order in the ordinary course of argument before a jury. Such verbiage adds no substance to counsel's argument; it furnishes no aid to the jury; it indicates lack of respect for the dignity of judicial proceedings. Although we condemn the routine use of such language in argument solely for purposes of stress or emphasis, we recognize that these terms may be properly quoted from the record or otherwise employed when it is appropriate to do so. In this instance, however, the use of such language was both unfounded and improper.
It is ordered, adjudged and decreed that the judgment holding defendants liable herein, is affirmed.
It is further ordered, adjudged and decreed that the awards of damages made herein in favor of plaintiffs be and the same are hereby reversed and set aside and this matter remanded to the trial court for a new trial on the issue of damages, all costs of these proceedings to date to be borne one-half by plaintiffs and one-half by defendants.
Affirmed in part, reversed in part and remanded.