530 So.2d 1175 (1988)
Valerie Deloris OGLETREE, William Timothy Ogletree and Daniel Todd Ogletree, Appellants,
v.
WILLIS-KNIGHTON MEMORIAL HOSPITAL, INC., et al., Appellees.
No. 19657-CA.
Court of Appeal of Louisiana, Second Circuit.
June 1, 1988.
Writ Denied October 14, 1988.
*1176 Wilkinson, Carmody & Gilliam by Mark E. Gilliam, Shreveport, for appellants.
Watson, Blanche, Wilson & Posner by Peter T. Dazzio and Michael M. Remson, Baton Rouge, for appellees, Willis-Knighton Memorial Hosp.
Cook, Yancey, King & Galloway by Sidney E. Cook, Shreveport, for appellees, Dr. Charles Byrd and Hartford Acc. & Indem. Co.
Davenport, Files & Kelly by William G. Kelly, Jr., Monroe, for appellees, Dr. Bryan Mills and Vigilant Ins. Co.
Before SEXTON, NORRIS and LINDSAY, JJ.
NORRIS, Judge.
This is a suit alleging medical malpractice. The plaintiffs are the three major children of Mr. William Ogletree, who died of gas gangrene at Willis-Knighton Hospital despite two days of treatment following *1177 an auto accident. The named defendants were Willis-Knighton, Dr. Byrd and Dr. Mills, and the doctors' respective insurers. Before suit was filed, a medical review panel determined that neither the doctors nor the hospital had breached the appropriate standards of care. Before trial, Dr. Mills and his insurer were released on an unopposed motion for summary judgment. A twelve-member jury concluded that neither of the remaining defendants was liable. The plaintiffs' motion for judgment n.o.v. or a new trial was denied and judgment for the defendants was entered. The plaintiffs now appeal and, for the reasons expressed, we affirm.

FACTS
Early on the morning of Saturday, November 4, 1978, Mr. Ogletree was involved in an auto accident. It was the first day of deer season and he was driving a jeep to the woods along with a small hunting party that included his son, plaintiff Tim Ogletree. Tim was following behind his father in a car. For reasons irrelevant to this lawsuit, the jeep swerved off the road and overturned in a roadside ditch. Mr. Ogletree was pinned inside the jeep. With the help of some passers-by, Tim lifted the jeep so Mr. Ogletree could climb out. He waited for the police to arrive and then Tim drove him to the emergency room at Willis-Knighton. He was admitted at 5:14 a.m.
The emergency room physician, Dr. Mills, diagnosed a laceration in the face, several fractured ribs and a puncture tear in the area of the left buttock. Dr. Mills treated the chest wound until 6:00 a.m., when he went off duty. The next doctor, Dr. Calleton, treated the face wound and determined the buttock wound was too deep and filled with debris such as grass and dirt to be properly treated in the emergency room. He called the surgeon, Dr. Byrd, who arrived at the emergency room around 8:00 a.m. and took Mr. Ogletree to surgery at 8:45.
Because of the risk that broken ribs might damage the lungs, Dr. Byrd could not place Mr. Ogletree under general anesthesia. Instead he administered a caudal block and only then was he able to spread Mr. Ogletree's legs wide enough to permit an opening of the buttock wound. The wound was located roughly in the crease between the left leg and the perineum. It was large, about three inches deep, and contaminated with what Dr. Byrd characterized in his operative report as "a large amount of foreign bodies, such as dirt and grass," chiefly in the upper aspect of the wound. Dr. Byrd later testified that by "dirt and grass" he meant foreign bodies, and in reality these appeared to be debris such as paint, grease and fabric. He irrigated the wound by jet lavage with Ringer's lactate. He discovered that the adductor muscle groups had been torn loose; he reattached them. Feeling that the wound was adequately cleansed and wanting to foster maximum healing of the muscles, Dr. Byrd sutured the wound loosely shut, leaving enough space for four Penrose drains that he inserted. He testified that he also debrided the inside of the wound, removing a small amount of damaged fatty tissue, although the operative report does not list this specifically and no tissue was ever sent to pathology. He did not administer antibiotics at this time. After the surgery, Dr. Byrd sent Mr. Ogletree to the recovery room and then to the intensive care unit (ICU), where he felt the patient would receive closer monitoring on a Saturday.
Post-operatively Mr. Ogletree ran a lowgrade fever and had an elevated pulse and respiration, but the nurses did not summon Dr. Byrd; the experts mostly agreed that mild fever is common after a traumatic accident or surgery, and that shallow, quick respiration is typical among patients with broken ribs, for whom deep breathing is painful and dangerous. Although the nurses notes do not reflect this, Dr. Byrd testified that he visited Mr. Ogletree before he left for the day, around 3:00 p.m., and that the patient appeared to be in no distress. As the caudal block wore off, Mr. Ogletree began to complain of pain, but Dr. Byrd, expecting this, had left orders authorizing the nurses to give him shots of demerol and phenergan as needed for pain. *1178 Starting Saturday afternoon, Mr. Ogletree requested the shots and they were given at roughly four hour intervals.
By 11:00 p.m. Saturday, Mr. Ogletree's temperature had elevated to 101.8° and his pulse and respiration to 120 and 28 respectively. The nurses did not call Dr. Byrd with this information, and although he said it was "significant," he testified he would not expect to be called about it without other symptoms; one-half of his post-operative patients get temperatures this high. At 12:50 a.m. Sunday, Mr. Ogletree was awake and complaining of pain. The wound issued some drainage that was bloody-tinged; Dr. Byrd testified this was why the Penrose drains had been used. A slightly stronger shot of demerol was given and it appeared to help, as Mr. Ogletree went to sleep and his temperature and pulse dropped.
At 11:00 a.m. Sunday, Dr. Byrd came to see his patient. Mr. Ogletree was alert and talkative, but complained that his leg was sore and that he could not take any deep breaths. The wound was not red and displayed only minimal swelling. Dr. Byrd examined a chest X-ray and although it was good he gave an antibiotic, Nebcin, to guard against possible pneumothorax. He was happy with Mr. Ogletree's progress. Through the afternoon Mr. Ogletree continued his pain medication and rested. Nurse Delude testified that at 2:00 p.m. she changed the dressing; there was some drainage and a foul, perhaps fecal, odor, but the wound was clean and Mr. Ogletree was not complaining. There was also some discoloration and swelling, but none worse than before. She did not call Dr. Byrd. According to the nurses notes, at 5:00 p.m. Mr. Ogletree had a "regular diet" meal.
At 5:50 p.m., a nurse noticed some alarming changes in Mr. Ogletree's vital signs. His pulse was 160, his respiration 48, and his blood pressure 100/60. He had severe pain in the left thigh, which was edematous and purplish in color. The nurses promptly paged Dr. Byrd, who was not at the hospital. He called from home at 6:00 and was told that Mr. Ogletree was very short of breath, did not look good and had a swollen leg. Dr. Byrd, suspecting a pulmonary embolus, ordered a gas blood test. At 6:10, he instructed the nurses to elevate the leg and wrap it at the calf in an effort to improve the veinous flow. By 6:30, when Dr. Byrd was en route to the hospital, Mr. Ogletree's blood pressure had dropped to 90/60, his leg was more swollen and discolored, and blebs were forming on his skin. At 6:50, Dr. Byrd arrived at bedside and found the leg swollen over 40% and marked with large blisters; he felt crepitance in the flesh. He then diagnosed gas gangrene, a severe and deadly infection caused by the bacteria Clostridium perfringens. The bacteria or its spores live everywhere, and notably in soil. The infection thrives in an air-free environment such as a closed wound and typically spreads with such phenomenal speed that it is described as "fulminating." Dr. Byrd assembled a surgical team for exploratory and debridement surgery. He administered 10,000,000 units of penicillin and ordered further X-rays and a Gram test. He later administered massive doses of Chlormycetin and Keflin.
Surgery began at 8:20 p.m., by which time the infection had advanced considerably. Before Dr. Byrd's eyes, blisters and blebs were forming and opening. Mr. Ogletree was given general anesthesia and then heavily sedated with dilaudid, a strong narcotic. Dr. Byrd reopened the original incision and found it free of foreign material and undiseased, but some air came out. In search of the air pockets he made two long incisions from the wound down the thigh. The upper layers were healthy but the deep muscles were extremely diseased. Making another incision upward above the hip level, Dr. Byrd discovered the disease was localized from the mid-thigh to the groin and above. The diseased tissue was so devastated that it could be practically wiped away with a cloth, without the need of actual cutting. Dr. Byrd testified he removed all the dead tissue and went into healthy tissue that bled profusely. He left these wounds open because oxygen kills the bacteria; he packed the incisions with Betadine-soaked gauze. He considered amputation, but felt this would be ineffective as the bacteria had already advanced past *1179 the hip-joint and into the body cavity. He also considered the surgical option of a hemicorporectomy, which would involve the removal of the body except for vital organs from the waist down, but he decided that Mr. Ogletree would not be able to survive such radical surgery in his condition. Dr. Byrd stabilized the patient by 11:00 p.m. and stayed with him until about 1:00 a.m. Monday. The nurses called him hourly at home, and he returned to the hospital Monday at 7:00 a.m., staying with Mr. Ogletree until his death shortly before 10:00 a.m.
In addition to the testimony, hospital reports and nurses notes just summarized, there were other bits of evidence introduced at trial. First was the lab report of a Gram stain test dated November 4 (Saturday) by the hospital and showing "large numbers of Gram-positive bacilli morphologically consistent with Clostridia." Dr. Byrd testified that the only Gram stain he ordered was on the evening of November 5 and that the earlier date on the lab report must have been an error. Next there was an X-ray report in which the radiologist, viewing a pelvic X-ray, noted "considerations should include gas gangrene." The X-ray was taken Saturday morning in the emergency room but the report was not dated until November 8, four days after the X-ray was taken and two days after Mr. Ogletree died. Dr. Byrd testified that he saw the X-ray Saturday morning and that it did not show anything unusual; he did not have to rely on the radiologist's interpretation. Despite repeated motions for discovery, the hospital never produced this X-ray. Finally there was the "Position Paper" that Dr. Byrd submitted to the medical review panel to explain his approach to the prophylactic use of antibiotics. We will discuss this under the assignment pertaining to breach of standard.
The plaintiffs' experts included Dr. Richard Williams, a retired general surgeon from New York state, now living in Florida; Dr. Charles Marks, Professor of Surgery at the LSU Medical Center in New Orleans, Senior Attending Surgeon at Charity Hospital in New Orleans and a Board-certified surgeon; and Dr. Herbert Dupont, Chairman of the Department of Infectious Diseases and Clinical Microbiology at the University of Texas in Houston, and a Board-certified internist. The defendants' experts included the three physicians who had served on the medical review panel: Dr. John Haynes, a board-certified family practitioner in Vivian, Louisiana and Chief of Staff at North Caddo Memorial Hospital; Dr. Dean Griffin, a board-certified surgeon practicing at Highland Clinic in Shreveport; and Dr. James Eddy Jr., a retired surgeon and member of the American College of Surgeons, now doing consultant work at Schumpert Hospital in Shreveport. The substance of the experts' testimony will be summarized in the assignment dealing with breach of standard.

ASSIGNMENT NO. 1: Exclusion of evidence and improper attack on plaintiffs' witness.
By this assignment appellants urge the trial court erred in excluding evidence of a conspiracy of silence among local physicians that was offered to rebut the defendants' attacks on plaintiffs' witnesses as "out-of-town hired guns." The plaintiffs' first expert witness, Dr. Williams, after giving extensive testimony based on the medical records, was asked on redirect to explain "what is known as the conspiracy of silence." R.p. 502. The defense attorneys objected and their objections were sustained. No further questions about this were asked of Dr. Williams or anyone else. Earlier, in opening statements, Dr. Byrd's counsel, Mr. Cook, had referred to Dr. Byrd as "your fellow citizen" and a doctor who "treat[s] your fellow citizens." R.p.p. 295, 297, 304. Plaintiffs' counsel did not object to these statements.
Before we turn to the statutory and jurisprudential means of counteracting the conspiracy of silence, we would note that the objections were properly sustained, and the testimony excluded, on the basis of elementary rules of evidence. All expert testimony requires a factual foundation and opinion testimony must be based on fact. Davis v. Galilee Baptist Church, 486 So.2d 1021 (La.App. 2d Cir.1986); State, Dept. of Hwys. v. Beaird-Poulan *1180 Inc., 292 So.2d 842 (La.App. 2d Cir.1974), amended on other grounds 305 So.2d 505 (La.1974); Marks v. Pan Amer. World Airways, 591 F.Supp. 827 (E.D.La.1984). The foundation provided in this case was not sufficient. There was no evidence that any local doctor had been approached to testify and declined simply because Dr. Byrd was "one of their own." The evidence does show that three local doctors, including the plaintiffs' nominee, Dr. Haynes, were approached, reviewed the record and concluded that Dr. Byrd did not breach the standard of care, but this does not show a conspiracy of silence. Furthermore, Dr. Williams's knowledge of the solidarity among local doctors would appear to be limited to Annapolis, Maryland and Warsaw, New York, where he had practiced, and perhaps to Sarasota, Florida, where he has lived since 1979. The cohesiveness and mutual support of doctors in Shreveport would seem out of the realm of his personal experience.
This discussion points out the difficulty in demonstrating an actual conspiracy of silence. However, the courts of this state and other states have recognized the potential of a conspiracy and its adverse effects on plaintiffs. See Ardoin v. Hartford Acc. & Indem. Co., 360 So.2d 1331 (La.1978); Thibodeaux v. Aetna Cas. & Sur. Co., 216 So.2d 314 (La.App. 3d Cir.1968); see also Steiginga v. Thron, 30 N.J. 423, 105 A.2d 10 (1954). To offset this danger, the Louisiana Supreme Court has held that in a malpractice action against a medical specialist, the specialist's duty is not governed by the professional standard within a particular locality or community. Ardoin v. Hartford Acc. & Indem., supra at 1335; see also Steinbach v. Barfield, 428 So.2d 915 (La.App. 1st Cir.1983), writ denied 435 So.2d 431 (La.1983). Ardoin interpreted a statute enacted in 1975, LSA-R.S. 9:2794.[1] The court's discussion in Ardoin, especially at page 1337, makes it clear that one of the objectives of adopting national rather than local standards for specialists is to overcome the potential evils of a conspiracy of silence. When an expert like Dr. Williams attempts to establish a national standard on the basis of his experience in New York and Maryland, there is no real need to prove that local doctors would not testify. The necessary testimony is adduced from witnesses like Dr. Williams without the plaintiff having to show that local physicians could not have been engaged. We are sure that in certain instances a plaintiff may want to lay the proper foundation, produce an appropriate witness and prove an actual conspiracy. However, when experts from outside the community are secured and purport to present evidence of a national standard, it seems unnecessary to produce further evidence of a conspiracy. The impact of plaintiffs' argument is apparently to transform an implied conspiracy into a supposition that local doctors who do testify on behalf of a defendant are untruthful. However, this addresses itself to the issue of credibility; the potential conspiracy is solved and the danger offset by using nonlocal experts. Proof of an actual conspiracy is irrelevant.
*1181 In the instant case, the plaintiffs secured several expert witnesses, some of whom had impressive credentials. To allow Dr. Williams to speculate without foundation as to an alleged conspiracy of silence would have no other effect than to prejudice the jury against the defendants' experts. The testimony was properly excluded and this assignment does not present reversible error.

ASSIGNMENT 3: Inflammatory argument.
By this assignment appellants urge, in essence, that defense counsel Mr. Cook inflamed the jury by advancing arguments calculated to appeal to the jury's passions and prejudices.[2] Appellants cite several instances in closing argument where Mr. Cook referred to the plaintiffs' experts as "out-of-town doctors," "out-of-town socalled experts" and "hired guns," while referring to the defense experts as "the finest doctors right here in Shreveport that you'll find anywhere in the United States." R.p.p. 1466, 1470, 1476. They direct our special attention to where Mr. Cook describes Dr. Williams as "absolutely the bottom of the barrel" and chides Dr. Marks for holding himself out as a doctor who "[doesn't] do anything wrong." R.p.p. 1477, 1482.
All parties are entitled to a fair trial on the merits of the case, uninfluenced by appeals to passion and prejudice. Counsel should confine the argument to the evidence admitted and the inferences that may be properly drawn from it. In the lower court's opinion in Temple v. Liberty Mutual Ins. Co., 316 So.2d 783 (La.App. 1st Cir.1975) (rev'd on other grounds, infra), the court explained:
The test of whether argument of counsel is prejudicial or inflammatory is whether such comment is unreasonable or unfair in the eyes of the law. When the language used is such as discloses a studied purpose to arouse the prejudices of the jury, the court cannot overlook it or consider that a party against whom such effort has been made has had a fair consideration of its case at the hands of the jury. 316 So.2d at 793.
It is equally well settled that counsel has great latitude in argument before a jury, and fair advocacy not designed to inflame the jury is permissible. Temple v. Liberty Mut. Ins. Co., 330 So.2d 891 (La. 1976); Bossier v. DeSoto Gen'l Hospital, 442 So.2d 485 (La.App. 2d Cir.1983), writ denied 443 So.2d 1122 (La.1983).
The allegedly objectionable statements, however, were subject to corrective measures. The court admonished the jury both at the start of the trial and when all parties had rested that the statements of counsel were not evidence and should not interfere with its determination of the facts. R.p.p. 264, 1399. The court then clearly instructed the jury to disregard any remarks of counsel that were inconsistent with the evidence or law as charged. R.p. 1511. This served to counteract the possibly adverse effect of Mr. Cook's argument. Temple v. Liberty Mut. Ins. Co., supra. Further, plaintiffs' counsel did not lodge objections to any of the statements he now cites and condemns in brief. Failure to object constitutes a waiver of the right to complain of the argument on appeal. Temple v. Liberty Mut. Ins. Co., supra; Luquette v. Bouillion, 184 So.2d 766 (La.App. 3d Cir.1966); Brumfield v. Brumfield, 477 So.2d 1161 (La.App. 1st Cir.1985), writ denied 479 So.2d 922 (La.1985).
We also note the trial court denied plaintiffs' motion for a new trial. The trial court is in a better position than an appellate court to determine the possible prejudicial effects resulting from counsel's argument before a jury. Its refusal to grant a new trial should therefore be accorded great weight. Temple v. Liberty Mut. Ins. Co., supra.
Because the comments were not objected to and because corrective admonitions and instructions were given, this assignment does not present reversible error.

ASSIGNMENT 2: Standard of care.
By this assignment appellants urge they proved the national standard of *1182 care required of a specialist, and the jury's conclusion that the defendants did not breach the standard was clearly wrong. LSA-R.S. 9:2794[3] imposes on the plaintiff in a malpractice action the duty of proving the appropriate standard of care. White v. McCool, 395 So.2d 774 (La.1981); Paul v. St. Paul Fire & Marine Ins., 430 So.2d 285 (La.App. 3d Cir.1983). An unsuccessful course of treatment is not per se an indication of malpractice. Chaney v. State, Dept. of Health & Human Res., 432 So.2d 256 (La.1983); Gurdin v. Dongieux, 468 So.2d 1241 (La.App. 4th Cir.1985), writ denied 474 So.2d 946 (La.1985). Expert testimony is essential to establishing the standard in a technical field such as medical malpractice. Frasier v. Dept. of Health & Human Res., 500 So.2d 858 (La.App. 1st Cir.1986); Steinberg v. Indem. Ins. Co. of N. Amer., 364 F.2d 266 (5th Cir.1966). We have therefore studied the expert testimony very closely, along with Dr. Byrd's factual testimony and the documentary evidence. Under the standard of review, we are not to consider only so much of the evidence as will uphold or undermine the judgment, but rather the whole of the evidence with an eye to determining whether the judgment is plainly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978).
The experts agreed that gas gangrene, once developed, is difficult to control, thus necessitating special preventive measures. The plaintiffs' witnesses outlined five steps for preventing gas gangrene in a wound such as Mr. Ogletree's:
1. The wound must be thoroughly cleaned;
2. Damaged and dead tissue must be debrided;
3. The wound must be kept open;
4. Antibiotics must be administered; and
5. The patient must be closely monitored after surgery.
Thorough cleaning. In his operative report, Dr. Byrd stated that he used jet lavage and copious amounts of Ringer's lactate to irrigate the wound. This procedure removed a large quantity of foreign bodies such as dirt and grass from the wound. In the case summary, Dr. Byrd also stated he used Betadine in the wound. From reviewing these documents, Drs. Williams, Marks and Dupont could not conclude whether the cleaning was adequate or not.
Dr. Byrd testified that although he could not see all the cracks and crevices in the depth of the wound, most of the debris was in the superficial portion, which was completely exposed with retractors, and he felt he had cleaned it thoroughly. R.p.p. 950-957; 1085. He admitted that jet lavage, which is a sophisticated Water-Pik device, sometimes pushes material deeper into the wound. This would be crucial because debris carries the culprit bacteria and could cause infection if left inside. However, Dr. Byrd testified that by aiming the jet at a tangent, he felt the materials were flushed out. No one suggested any better means of irrigation. On the basis of the written reports and Dr. Byrd's testimony, the other experts, Drs. Haynes, Griffin and Eddy, concluded the cleaning was adequate.
Debridement. The operative report did not mention debridement at all, even though the case summary states that "formal debridement under anesthesia was accomplished." No specimens of debrided tissue were sent to pathology, although sending tissue for analysis would perhaps be standard procedure. R.p. 543. Based on this evidence, Dr. Williams presumed that no debridement was done; Drs. Marks and Dupont could not reach a conclusion. Dr. Dupont admitted that perhaps there was "nothing to debride." R.p. 706.
Dr. Byrd testified that he found no dead tissue in the wound, only a small amount of damaged subcutaneous fatty tissue, and he performed appropriate debridement. Drs. Haynes and Griffin concluded that Dr. Byrd did adequate debridement; Dr. Eddy said the operative report was satisfactory as to debridement. We would note that Dr. Byrd's testimony was not inconsistent with Dr. Marks's interpretation of "no extensive debridement." R.p. 544. The defense *1183 experts testified it was not standard practice to send to pathology debrided tissue from wounds such as this.
Leaving the wound open. According to Dr. Dupont, this was Dr. Byrd's biggest failure; a wound must be left open so oxygen, which is fatal to Clostridium, might enter and so that contaminants might drain out. R.p. 706. Dr. Williams testified that doctors "all over the world" would leave this type of wound open. R.p. 381. Dr. Marks admitted that some doctors would close the wound but insert widebore tubing, unlike Penrose drains, for drainage. R.p. 665.
The defense experts acknowledged that many doctors leave wounds open, but that in any given case it was a question of medical judgment based on the cleanliness and location of the wound. If the surgeon feels that the contaminated wound is clean, he may close it with drains inserted. Dr. Byrd testified that he closed the wound loosely and used drains which appeared to be working. Drs. Haynes and Griffin agreed with this treatment. Dr. Eddy testified that he almost always closed wounds. R.p. 1258.
Dr. Byrd conceded that some wounds should be left open. His testimony, however, added another dimension to the issue of closure by citing the extensive muscle damage he found in the wound. He wanted to reattach the adductor muscles and restore use of the left leg to Mr. Ogletree. By leaving the wound open, this could not have been accomplished. R.p. 959. Dr. Byrd also testified that because of the wound's unusual location, it could not have been kept truly open without causing considerable pain to the patient; Mr. Ogletree's legs would have to be kept spread apart until the wound could be closed. Apparently Dr. Byrd recognized the benefit of keeping the wound open, as well as the need to restore muscle function by suturing the wound loosely and providing for drainage.
Antibiotics. Dr. Byrd admitted he did not give antibiotics for gas gangrene infection until late Sunday. All the experts testified that penicillin, and certain others like Cephalosporin or Keflin, are effective against Clostridium bacteria. Nebcin, which Dr. Byrd had given earlier, would not be effective against it. Also ineffective against it was Clindamycin, which Dr. Williams had originally recommended in deposition. The plaintiffs' witnesses all testified they would have given penicillin from the start, even before there was actual evidence of infection. Dr. Dupont, however, admitted that the preventive or prophylactic use of antibiotics was "controversial." R.p. 701. He testified that there were alternate schools of thought, and the defense experts agreed. Drs. Haynes and Griffin felt that antibiotics should not be necessary in a wound that has been adequately cleaned, debrided and drained. Eddy felt that most doctors would not use antibiotics for trauma patients. R.p. 1259.
Dr. Byrd's theory, advanced in his position paper submitted to the medical review panel, was "not to institute prophylactic antibiotics in wounds that are not over three hours duration before [he evaluates] them." This statement would suggest that Dr. Byrd might have given antibiotics for a wound that was over three hours old, and indeed Mr. Ogletree's was over three hours old when he evaluated it. However, Dr. Byrd emphatically stated in court that the sentence in the position paper contained a misprint or typographical error because it was wrong. R.p.p. 1097, 1098. He explained on direct examination that antibiotics would be effective if administered before a planned surgery or even within about three hours of a traumatic injury. After three hours, however, tissue around the injury is swollen and the capillaries are too constricted to convey the antibiotics to the site. Thus with an injury over three hours old, Dr. Byrd expressed his true position as not to give antibiotics unless he found evidence of infection. R.p.p. 972-978. As noted, this decision was approved by the defense experts and was recognized as an alternative by Dr. Dupont.
Close monitoring. Without reciting the hourly vital signs recorded in the nurses notes, we would summarize the appellants' argument by saying that various observations, *1184 such as the temperature spike on Saturday night, the continued pain in the leg, the drainage and the alleged foul odor on Sunday afternoon, all should have alerted the nurses to serious complications which might have been averted had action been taken sooner. However, the experts were not able to agree upon any symptom or point in time when the nurses should have become alarmed. Dr. Williams could not say when the infection was established, based on the nurses notes. R.p. 464. Dr. Dupont cited the temperature spike as a "red flag," but admitted it was consistent with other bacterial infections. R.p. 710. Dr. Marks testified more strongly that the spike on Saturday night would have suggested to him the need to examine for local and general changes in the patient. R.p. 591.
Dr. Byrd testified he placed Mr. Ogletree in ICU because of the more intensive monitoring there. He reiterated that the patient's symptoms were consistent with broken ribs, surgery, or other influences. Despite the temperature spike on Saturday night, Mr. Ogletree still exhibited no telltale signs on Sunday morning.
Drs. Griffin and Eddy stated that with the benefit of hindsight, they could see that symptoms on Saturday night were consistent with incipient gas gangrene. At the time, however, the symptoms were non-specific, and Dr. Griffin admitted he would not have picked up the diagnosis then. R.p. 1239. Dr. Eddy likened the after-the-fact diagnosis to "betting on a horse after the race is over." R.p. 1273. Under the circumstances at the time, particularly with the patient's large chest wound, he felt a doctor would not assume that gas gangrene was developing.
This summary of the evidence would support a factfinder's conclusion that for each of the steps prescribed by plaintiffs' experts, Dr. Byrd either complied with it fully (irrigation), complied with it substantially (debridement, monitoring), or offered a cogent explanation of why it was inadvisable to comply (leaving the wound open, giving antibiotics). It would also support a conclusion that Willis-Knighton substantially complied with its duty of close monitoring. Naturally, if we could view only selected testimony of Drs. Williams, Marks and Dupont, together with the bare hospital record, we would have difficulty affirming the verdict. Likewise, if we could impute malpractice to a physician who failed to follow a course of treatment that proves, at a later date and in retrospect, to have been a wiser course, we would have difficulty affirming. Lindsey v. Michigan Mut. Liab. Co., 156 So.2d 313 (La.App. 4th Cir. 1963), writ denied 245 La. 461, 158 So.2d 612 (1963). However, when we consider the totality of the evidence, as we are enjoined to do, we cannot conclude that the verdict is plainly wrong. Arceneaux v. Domingue, supra. In essence, the plaintiffs' experts attempted to establish a standard of care and stated the opinion that the defendants had breached it. The defense experts implicitly accepted the standard in part, modified it in part and expressed the opinion that defendants did not breach it. The medical expertise of each expert was revealed to the jury and all the experts provided the foundation of their opinions. The jury apparently accepted the opinions of the defense experts, and this was within its province. Matthews v. LSU Med. Center, 467 So.2d 1238 (La.App. 2d Cir.1985); Neumeyer v. Terral, 478 So.2d 1281 (La. App. 5th Cir.1985), writ denied 481 So.2d 631 (La.1986); Fleming v. Michigan Mut. Liab. Co., 363 F.2d 186 (5th Cir.1966). We would note that Dr. Williams's medical expertise was severely criticized, and that apparently none of the plaintiffs' experts listened to Dr. Byrd's testimony, which considerably enlarged the bare hospital record, or to the defense experts. The jury was entitled to accept the testimony of those experts who had considered all the evidence.
We also note the credibility call between the hospital record and Dr. Byrd's testimony. They differed with respect to debridement, but the other expert evidence implied that a small debridement might not make it into the medical report. They differed with respect to the kind of foreign matter removed from the wound, but the jury could surely evaluate any motive Dr. Byrd might *1185 have for correcting his operative report to reflect contamination with a less suspicious substance such as paint or grease. Dr. Byrd also asserted his cleaning was thorough, and this is supported by the operative report of the second surgery. As for the second surgery, the plaintiffs' experts felt that Dr. Byrd's heroic measures in this instance were not adequate, although they conceded the patient's chance of survival was by then very remote. See, e.g., Dr. Marks, R.p. 1368. The defense experts felt that Dr. Byrd's efforts in the second surgery were satisfactory and agreed that Mr. Ogletree's chances were very remote. See, e.g., Dr. Eddy, R.p. 1276. The jury's credibility call, if supported by the evidence, is entitled to great deference. Canter v. Koehring Co., 283 So.2d 716 (La.1973). On this record we can find no basis for disturbing it.
This assignment does not present reversible error.

ASSIGNMENT 4: Locality rule.
By this assignment appellants urge the defendants presented only a local standard and prejudiced the jury to apply the erroneous locality rule. As noted before, a medical specialist is held to the standard of care exercised by the practitioners in his specialty and not in his locality. LSA-R.S. 9:2794; Ardoin v. Hartford Acc. & Indem. Co., supra. We have already rejected the argument in this case that the exclusion of testimony about the "conspiracy of silence" was improper. Thus this assignment asks us to consider whether the jury's decision to accept the testimony of the local experts and reject that of the nonlocal experts amounted to an impermissible application of the locality rule.
At the outset we note that four of the experts, as well as Dr. Byrd himself, were Board-certified and presumably equally competent to establish national standards. The plaintiffs' witnesses, in announcing their standard, generally did not designate it as national.[4] The one exception was when Dr. Williams testified that "doctors all over the world" would have left the wound open. R.p. 381. None of the other plaintiff experts described their standards as national, thus opening speculation that they might be more stringent than "ordinarily practiced." For instance, the professors at medical schools might instruct students to make highly detailed reports of surgery for hospital records, but practitioners nationwide might "ordinarily practice" less detailed reportage due to the restraints of time and patient care. The jury could have concluded that diagnosis and treatment of gas gangrene was perhaps not as straightforward as the plaintiffs' witnesses proposed. The jury could consider Dr. Williams's experience of failing to diagnose a case of it in New York and his recommendation of an ineffective antibiotic in deposition, or Dr. Dupont's article describing the elusiveness and unclear symptomatology of the disease. The jury might have concluded on the basis of this evidence that the standards outlined by the plaintiffs' witnesses were aspirational and not representative of the national norm.
In Neumeyer v. Terral, supra, the court considered the effects of the "battle of experts" in a malpractice case:
This case is a classic example of what happens in a tort action where negligence turns on opinion evidence. The expert medical opinions offered by the defendants are in conflict with or diametrically opposed to the medical experts' opinions submitted by the plaintiffs to support plaintiffs' theory of negligence and causation. This, in our view, is not a reflection on the integrity of the individual expert witnesses or of the medical profession. Rather, it demonstrates the fact that medicine is not an exact science; hence, there are differences of opinion within the profession as to the diagnostic tests which should be conducted in a given set of circumstances or as to the effectiveness and side effects resulting from the administration of a particular drug, its dosage or the number of times administered and as to the diagnosis when the objective symptoms are agreed upon. Therefore, there were substantial *1186 differences of opinion as to what constituted [the standard of care] as well as to whether the doctors involved here exercised that degree of care in this instance. The mere choosing by the jury of one expert's views over that of another does not in and of itself constitute reversible error. 478 So.2d at 1290, 1291 (emphasis added).
To this we would add that by choosing the standard advanced by the local experts, the jury has not automatically applied the locality rule and committed reversible error. As in Neumeyer, the jury heard conflicting testimony and endeavored to decide whether there was a breach of duty. If the verdict is not plainly wrong, we will not reverse it. In the present circumstances we do not find manifest error. While we are sympathetic with the plaintiffs and appalled by the swift destruction that the disease wrought, we are unable to hold on this record that the jury improperly applied the locality rule to reject the testimony of the plaintiffs' witnesses. Under the evidence presented, the verdict is not plainly wrong. This assignment does not present reversible error.

CONCLUSION
For the reasons expressed, the judgment is affirmed at appellants' costs.
AFFIRMED.
NOTES
[1] LSA-R.S. 9:2794 provides in part:

§ 2794. Physicians, dentists, and chiropractic physicians; malpractice; burden of proof; jury charge
A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., a dentist licensed under R.S. 37:751 et seq., or a chiropractic physician licensed under R.S. 37:2801 et seq., the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
[2] Appellants also re-urge exclusion of evidence of a conspiracy of silence.
[3] See footnote 1, supra.
[4] The defense experts likewise did not designate their position as national.