718 So.2d 1029 (1998)
Rose COOPER and Harvey Cooper, Plaintiff/Appellant,
v.
UNITED SOUTHERN ASSURANCE CO., Monroe Guaranty Insurance Company, Prudential Property and Casualty Insurance Company, Catherine Abraham and Richard Shawver, Defendant/Appellee.
No. 97 CA 0250.
Court of Appeal of Louisiana, First Circuit.
September 9, 1998.
*1030 Michael Hingle, Michael A. Sevante, Slidell, for Rose Cooper Plaintiff/Appellant.
Thomas M. Richard, Metairie, for Monroe Guaranty Insurance Co. Defendant/Appellee.
Before FOIL, WHIPPLE and KUHN, JJ.
KUHN, Judge.
In this personal injury suit, plaintiff, Mrs. Rose S. Cooper, appeals a judgment dismissing claims asserted against her underinsured motorist insurance carrier, defendant, Monroe Guaranty Insurance Company ("Monroe").[1] *1031 The judgment is based on a jury verdict that Mrs. Cooper's injuries were not caused by a May 3, 1993 automobile accident, as she alleges. On appeal, we address: 1) whether Mrs. Cooper's counsel preserved the right to appeal regarding various comments made by Monroe's counsel during the trial which Mrs. Cooper contends were prejudicial to her case, and whether these comments warrant an interdiction of the jury's verdict and a de novo review of the evidence by this court; 2) whether the introduction of evidence regarding the Cooper's ownership and use of various boats was prejudicial; 3) whether the jury erred in finding that Mrs. Cooper did not carry her burden of proof regarding causation; and 4) whether the jury erred in failing to award damages to Mrs. Cooper. We affirm.

FACTS AND PROCEDURAL BACKGROUND
On May 3, 1993, Mrs. Cooper was traveling east in a 1989 Dodge Dynasty on Gause Blvd. in Slidell, Louisiana, with her husband, Mr. Harvey J. Cooper, Jr., as a passenger. Ms. Catherine Abraham was also traveling east on Gause Blvd. in a 1987 Honda Accord. Mr. Richard Shawver traveled directly behind the Coopers and Ms. Abraham in his 1983 Datsun 200 SX. Mrs. Cooper brought her vehicle to a stop because the vehicles in front of her were turning. Mrs. Abraham also stopped her vehicle due to the turning traffic. Shawver was momentarily distracted, looking to his left, and when he looked forward again, he realized the vehicles in front of him had stopped. Although he applied his brakes, he struck the rear of the Abraham vehicle, which moved forward hitting the rear of the Cooper vehicle.
Ms. Abraham testified at trial that her vehicle was moved forward about five feet by the impact of the Shawver vehicle. She characterized the impact between her car and the Cooper vehicle as "light." Ms. Abraham stated that she saw no damage to the rear of the Cooper car, but explained that her car was damaged with most of the damage being at the rear of her car. Ms. Abraham testified she did not have pain following the accident. She recounted that Mrs. Cooper did not complain of pain or nausea while at the accident scene, and that Mrs. Cooper was walking around without difficulty.
Mr. Shawver testified he was traveling about fifteen miles per hour at the time of the accident. He stated the Abraham vehicle traveled about two feet after impact. When he asked the Coopers if they had any injuries, they responded that they were "okay." Shawver described the Abraham vehicle as having "light damage." He testified he did not notice any damage to the Cooper vehicle except a scratch.
Officer Chris Nugent of the Slidell Police Department investigated the accident. His accident report indicated he saw no damage to the Cooper vehicle, minor damage to the front and rear of the Abraham vehicle and moderate damage to the front of the Shawver vehicle. His report stated that Mrs. Cooper sustained minor injury. He explained when he asks someone if they're injured and he does not see open wounds, he indicates "minor injury" on the report.
Mrs. Cooper, who was fifty-three years old at the time of the accident, stated that her vehicle moved forward about a foot and a half due to the impact of the two vehicles. She described that she heard a bang and then felt the impact of each vehicle. She explained that her hands were on the steering wheel at the time of the first impact. According to her testimony, the first impact jarred her head back and forward and she turned her body to the right, resulting in her *1032 arm being pushed back into the seat. Mrs. Cooper stated that when she got out of the car, she was dizzy, nauseated and her head began hurting. She testified that by the evening of the accident, she had pain in her head, neck and the right side of her body.
Ms. Cooper obtained an estimate in the amount of $734.01 for the repair of the damages to her vehicle.
Mr. Cooper testified that the impact of the hit moved their vehicle forward about three feet. He stated that immediately after the accident, Mrs. Cooper felt nauseous and had a headache. When Rose's pain increased about two days later, Mr. Cooper contacted an attorney, who referred Mrs. Cooper to Dr. Stewart Altman.
Dr. Altman first examined Mrs. Cooper about four days following the accident. Dr. Altman, a general surgeon, testified he was no longer performing surgery and that his practice consisted primarily of evaluating, diagnosing and treating people with injuries from accidents. He testified that fifty to seventy percent of his patients are referred to him by plaintiff attorneys. When he saw Mrs. Cooper on May 7, 1993, she was experiencing pain in her mid-back, right arm, right sacroiliac area, right shoulder, and the right side of her neck. Following his examination, Dr. Altman diagnosed cervical spine sprain, trapezius muscle sprain, and lumbosacral sprain. Dr. Altman prescribed physical therapy for Mrs. Cooper's neck.
During May through August of 1993, Mrs. Cooper continued to complain of neck pain and also reported pain radiating into her arm and elbow. Dr. Altman's diagnosis changed to include the possibility of a nerve root compression in the neck and lumbosacral area and the possibility of a problem with a cervical disc. Dr. Altman testified that based on the history provided by Mrs. Cooper, he assumed the cause of Mrs. Cooper's complaints was the May 3, 1993 automobile accident.
During August of 1993, Mrs. Cooper was examined by Dr. Stuart Phillips, an orthopedic surgeon. Mrs. Cooper reported that she had developed neck, elbow and back pain after being involved in an automobile accident. She also reported right arm numbness, weakness in the right hand, and headaches. A physical examination revealed muscle spasm in the neck area, poor muscle strength and limited motion of the neck. An x-ray examination showed moderate to severe arthritis in the cervical spine, with the worst arthritis being at the C5-6 and C6-7 levels. Dr. Phillips opined that the arthritis pre-existed the accident. An MRI of the cervical spine was performed on September 17, 1993. At the C4-5 and C5-6 levels, the results of the testing were consistent with moderate cervical spondylosis secondary to hypertrophic ridging. At the C6-7 level, the results were consistent with significant degenerative disease. At the C7-T1, the test revealed a small left paracentral herniation.
Based on the testing, Dr. Phillips diagnosed that Mrs. Cooper had a cervical herniated nucleus pulposis at the C5-6 level. He explained that the ligament which holds the disc in place was injured, causing the disc to protrude beyond its normal margin and to impinge on the nerves. Dr. Phillips also testified that an EMG report showed that the numbness in Mrs. Cooper's hand was caused by the entrapment of the ulnar nerve at her elbow. Dr. Phillips prescribed conservative care for the neck and cortisone injections for her elbow.
In April of 1994, Mrs. Cooper's neck pain was severe, and a discogram was performed to determine whether there were any disc abnormalities. This procedure involves the placement of a needle into a disc, filling the disc with dye, and pressurizing the disc. If the ligament is torn, the dye leaks out of the disc. Dr. Phillips testified that the discogram revealed an abnormality at the C5-6 level. Following the discogram, Dr. Phillips recommended an anterior cervical fusion to relieve Mrs. Cooper's neck pain. He performed the surgery during July of 1994 with good results. According to Dr. Phillips' surgical notes, the C5-6 level disc was totally degenerative and tears in the ligaments indicated a ruptured disc.
Upon examining x-rays of Mrs. Cooper's neck taken during 1984 and 1989, Dr. Phillips acknowledged that degenerative changes were evident at the C5-6 and C6-7 levels. *1033 He stated that these changes made her more susceptible to injury from trauma.
Dr. Phillips testified that he did not believe there was a direct relationship between the damage to a vehicle and the injury sustained by a person in that vehicle. He explained the amount of injury depends on how the person is injured and the age and health of that person. He stated that a fifty-year-old person with some previous degenerative changes is more likely to get hurt than a well-conditioned seventeen-year-old person. Dr. Phillips testified that if the history provided by Mrs. Cooper was correct, he believed she injured herself in the automobile accident. However, Dr. Phillips acknowledged that Mrs. Cooper did not report that she had problems with numbness in her right hand prior to the automobile accident. Dr. Phillips also testified that Mrs. Cooper did not report to him that she had struck her right elbow in the accident. Although he believed there was a reference to her hitting her elbow somewhere in her medical records, he could not indicate where in her records this information was located.
During December of 1994, Dr. Bernard Manale, an orthopedic surgeon who is one of Dr. Phillips's partners, performed an ulnar nerve transposition to correct Mrs. Cooper's ulnar neuritis or neuropathy. Based on an assumption that Mrs. Cooper had jarred her right arm during the automobile accident, he believed the automobile accident was the most probable cause of Mrs. Cooper's symptoms of pain in her forearm, and tingling and numbness in the ring and fifth fingers of her right hand.
Dr. Manale reviewed a January 13, 1989 chart note written by Dr. Gus Gutnisky, a neurosurgeon who had treated Mrs. Cooper. At that time, she reported symptoms of headaches with her pain being "in the midline occipital area and off to the right side." Mrs. Cooper also reported to Dr. Gutnisky that she was having "occasional numbness and tingling in the right hand." X-ray examinations of the sinuses, skull and cervical spine were ordered at that time. The 1989 x-ray examination of the cervical spine revealed hypertrophic changes involving the C5-6 and C6-7 levels and borderline narrowing of the C6-7 intervertebral disc space. Dr. Manale stated the 1989 chart note regarding numbness and tingling in the right hand did not really help him because the most common cause for numbness and tingling in the right hand would be a carpal tunnel rather than an ulnar nerve.
Based on the results of the September 7, 1993 EMG, he believed he was dealing with a "fairly recent" entrapment of the ulnar nerve. Dr. Manale acknowledged that the medical records did not indicate that Mrs. Cooper had any bruises or bleeding on her right arm following the accident. He testified that Mrs. Cooper did not indicate to him that she had banged her elbow in the May 1993 automobile accident. Dr. Manale did not discuss with Mrs. Cooper whether she had symptoms of numbness or tingling in her right hand before the 1993 accident. However, he testified that if he assumed that Mrs. Cooper's hands were on the steering wheel at the time of the accident and her right arm was jarred, he believed that within a reasonable medical certainty, the wreck was the cause of the ulnar neuropathy and entrapment which he treated.
Dr. Morteza Shansnia, a neurologist, also testified regarding the cause of Mrs. Cooper's ulnar neuropathy. He stated that if he assumed that Mrs. Cooper was holding the steering wheel upon impact, he believed the flexion and extension of her elbow and the acute subluxation of her ulnar nerve was probably the cause of Mrs. Cooper's condition. He acknowledged the numbness and tingling referred to in the 1989 medical report could suggest that Mrs. Cooper had ulnar neuropathy problems before 1993. Dr. Shansnia's testimony was based on his review of the depositions of Dr. Laborde and Dr. Manale and the 1993 EMG report.
Dr. Phillips last examined Mrs. Cooper on August 7, 1995. She complained of some pain in her elbow and tenderness in the area where the surgery was performed, which he treated with a cortisone injection. Dr. Phillips acknowledged that as of the time of his deposition testimony on September 13, 1995, he was treating about twelve or more patients who had been referred to him by plaintiff's counsel, Mr. Hingle. Over the last five *1034 years he had seen about sixty or more of Mr. Hingle's clients and he believed that some of the other partners in his clinic were treating other clients referred by Mr. Hingle. Dr. Phillips testified that Mr. Hingle guarantees the medical bills for these clients.
Dr. Phillips stated that the referrals he receives from attorneys come from attorneys handling personal injury cases. He acknowledged that he testified in a deposition regarding another legal matter that he receives as many as ninety-five percent of his legal referrals from plaintiffs' attorneys. He also confirmed that in about one out of every ten cases in which he performs surgery, there is controversy regarding whether the procedure was necessary.
Mrs. Cooper testified that she began having neck pain as of the night of the accident and she began feeling numbness in her ring finger and little finger in the right hand a few weeks after the accident. She was treated by Dr. Altman for a few months. Although she attempted the physical therapy he prescribed, she stated her pain increased after attending the sessions, and he advised her to stop. Upon her attorney's referral, she saw Dr. Phillips, who performed diagnostic testing, including a painful discogram. Based on the results of the testing, Dr. Phillips recommended that she undergo a surgical procedure to correct a "bad disc" in her neck.
Mrs. Cooper described that she was in a lot of pain and in a poor emotional state before the surgery. She stated she "was just mentally a mess." She explained that fortyfive to sixty days before her neck surgery, she did not go out very much because of her pain. She testified that she was always in pain. The neck surgery was performed during July of 1994, about a year and three to four months after the automobile accident. After she recovered from the surgery, she no longer had neck pain. Mrs. Cooper also testified regarding the arm surgery she underwent. She described that the surgery helped her arm a lot but that it does tire easily and it is sometimes difficult for her to work.
When asked about symptoms she experienced prior to the accident, Mrs. Cooper testified she had never really complained of neck pain and did not remember having right arm pain or numbness in her fingers. She testified she did not recall seeing either Dr. M. Finn or Dr. J. Sanchez during September of 1984. She did not remember going to the hospital at that time and did not remember telling Dr. Finn that she had pain in the left scapular area radiating to the left arm and left neck.
Medical reports from Slidell Memorial Hospital, with Dr. Finn as the attending physician, indicate that Mrs. Cooper was admitted to the hospital on September 19, 1984, complaining of pain in the left scapular area, radiating to the left arm and left neck. Mrs. Cooper reported to Dr. Finn that she previously had similar type pains on the right side. Dr. J. Sanchez performed an orthopedic consultation. His notes indicate that Mrs. Cooper reported that she also had "some numbness in the ulnar nerve distribution of the left hand" which had improved since it occurred. X-ray examinations of the cervical spine revealed "early cervical spondylosis from the level of the C4-5, C5-6 and C6-7, the latter one being the most involved radiographically." Dr. Sanchez's diagnostic impression was scapulothoracic bursitis, left shoulder, and multiple level early cervical spondylosis. He recommended that the anti-inflammatory medications and conservative physical therapy ordered by Dr. Finn should be continued. When Mrs. Cooper was discharged from the hospital on September 22, 1984, her discharge diagnosis was cervical spine disease.
Mrs. Cooper recalled having seen Dr. Gutnisky during 1989 for pain in the back of her head. She testified that Dr. Gutnisky performed an MRI and advised her to see an ear, nose, and throat specialist for her sinus problems. She did not recall reporting to Dr. Gutnisky during 1989 that she had numbness and tingling in her right hand. She testified she had no right arm pain from 1989 until after the automobile accident. When questioned about neck pain before the accident, she stated that if she sat a long time, she "would have aches and pains back there."
*1035 Mr. Cooper testified that prior to the accident, Mrs. Cooper was perfectly normal. He explained she worked out, danced, bowled, and played golf. Mr. Cooper stated that after the accident, his wife was in pain, became reclusive, could not sleep at night, and suffered from headaches, neck aches, and pain in her right arm.
Dr. James Monroe Laborde, an orthopedic surgeon and biomedical engineer, examined Mrs. Cooper on April 25, 1994. She reported pain along the ulnar border of her right arm, some numbness in the little and ring finger of her right hand and pain in her neck. Mrs. Cooper denied neck problems prior to the May 1993 automobile accident. During a physical examination, Dr. Laborde did not detect muscle spasm or problems with the reflexes in her arms or the strength of her arms or hands. Dr. Laborde found a decreased sensation of the fourth and fifth fingers of the right hand which he described to be a subjective finding, meaning it is controlled by the patient.
According to Dr. Laborde, x-ray examinations performed in his office showed changes consistent with the aging process in the neck. He explained there were bone spurs and disc-space narrowing from C5 to C7. Dr. Laborde was not surprised that Mrs. Cooper had been diagnosed ten years earlier as having cervical spine disease. He stated that Mrs. Cooper's medical records from 1984 confirmed that the arthritis and cervical bone spurs in her neck were conditions which existed prior to the 1993 automobile accident. Dr. Laborde testified that the condition of Mrs. Cooper's cervical spine in 1994 was consistent with what it was in 1984.
Dr. Laborde also reviewed Mrs. Cooper's September 17, 1993 MRI test results. He explained that the test results showed the cervical discs were not herniated, slipped or fractured, and that the changes noted were consistent with the aging process. He opined the test showed a "wide spinal canal" with "plenty of room for the spinal cord and the nerve roots," and no neurocompression. He also stated the MRI showed "little indentations at the levels of the discs consistent with bone spurs" and a "disc bulge down low at the C7-T1 level." He described these types of changes as "part of the aging process." He explained that the report of Dr. Sherman I. Brown, the doctor who conducted the MRI testing, did not describe a disc herniation at the C4-5 or C5-6 levels. Dr. Laborde stated that the bone spurs, indentations, and hypertrophic ridging referred to by Dr. Brown were present prior to the May 1993 accident. In Dr. Laborde's opinion, there was no disc herniation at the C4-5 or C5-6 levels. Dr. Laborde believed that Mrs. Cooper had cracks and fissures in her discs due to the aging process as early as the 1980's. He explained once a disc has tears or cracks in it, the ability of the disc to retain fluid has been diminished.
Based on the 1993 MRI test results and the 1994 x-rays, Dr. Laborde did not see anything indicating that the condition of Mrs. Cooper's cervical spine was attributable to any sort of trauma or accident. He explained that the degenerative changes in Mrs. Cooper's neck were preexisting conditions. He found no specific or objective evidence that she had sustained physical injury as a result of the May 1993 automobile accident. Dr. Laborde testified that the diagnostic testing did not show any indication for surgery. He explained that if a patient had a herniated disc at the C5-6 level, you would expect to see an abnormality on the MRI and then some objective finding on the clinical examination consistent with the objective finding on the MRI, such as numbness on the thumb and on the radial side of the arm. In Mrs. Cooper's case, he found no objective finding on the MRI that fit her subjective complaints.
Dr. Laborde also reviewed the test results of an EMG nerve conduction study, which was performed during September of 1993 by Dr. Gerald Burns at Dr. Phillips' request. Dr. Laborde commented that the EMG results showed no indication of nerve abnormality in the neck. Dr. Laborde believed that the normal EMG and normal MRI indicated Mr. Cooper did not have a problem in her neck. When Dr. Laborde was questioned about the value of the cervical discogram as a diagnostic tool, he testified that he thought the procedure was unreliable, worthless and could actually cause damage. He *1036 stated that in his experience, nine out of ten patients who have discography are plaintiffs in personal injury or workers' compensation suits.
According to Dr. Laborde, the EMG showed an abnormality in the ulnar nerve below the elbow. Dr. Laborde testified that the most common cause of this type of abnormality is leaning on the nerve while sitting, or the bending and straightening of the elbow, which causes irritation of the nerve as it shifts back and forth. Dr. Laborde stated it was rare that injury to the nerve was caused by a direct blow. In those cases, he stated you would expect to observe physical injury to the elbow such as bruising or bleeding. He testified that Mrs. Cooper never informed him that she had struck her elbow during the May 1993 accident. Based on Mrs. Cooper's complaints of numbness and tingling in her right hand during 1989, Dr. Laborde believed the ulnar neuropathy existed prior to the 1993 automobile accident. He explained that Mrs. Cooper's hypermobile ulnar nerve condition was not due to an injury but was something that had developed slowly over the years. On cross-examination, Dr. Laborde testified that while it was possible that Mrs. Cooper's ulnar nerve condition was caused by trauma, it was not probable. He stated he had never seen an ulnar neuropathy or entrapment caused by someone being jolted or jarred in an automobile accident while their hands are on the steering wheel.
After Dr. Laborde's initial exam of Mrs. Cooper, he prescribed anti-inflammatory and antidepressant medications, and advised against surgery. Dr. Laborde examined Mrs. Cooper again during July of 1994, shortly before she underwent the cervical fusion and disc removal surgery. He again advised against the surgery and recommended that Mrs. Cooper be psychologically evaluated; he believed her problems were more likely psychological than physical.
Dr. Laborde examined photographs evidencing the damage to the cars caused by the accident. He described the limited amount of physical damage to the Cooper vehicle, characterizing the impact as "lowvelocity." Based on his knowledge of orthopedic biomechanics and his orthopedic surgical experience, he explained there was a low probability of such an impact causing injury to an occupant. Although he testified that this type of low-impact, low-energy accident usually would not cause symptoms in most patients, he acknowledged that such an accident could possibly cause a muscle strain or soft-tissue injury which should heal in a few weeks. He estimated the chances of this type of impact causing a disc herniation would be extremely low, approximately one out of one hundred, and the chances of this type of impact causing an ulnar neuropathy as extremely unlikely, approximately one out of one thousand.
Dr. Laborde acknowledged that Mrs. Cooper's disc degeneration increased the possibility she would sustain an injury in a low-impact accident. However, he indicated that even considering the disc degeneration, there was still a very low probability of injury arising from the May 1993 accident. In his opinion, the accident more probably than not did not cause Rose's conditions for which she under went the two surgeries.
During March of 1995, Dr. Daniel Scullin, a diagnostic radiologist, reviewed Mrs. Cooper's radiographic films and diagnostic testing dated during 1984, 1989 and after the May 1993 accident. He found the reports from each of these years described degenerative changes in the spine. He explained that a combination of disc narrowing and bony spurs or ridges were present in each of the three sets of films. He found no evidence of a C5-6 level herniation in the 1993 MRI films. He testified that although there appeared to be a small herniation at the C7-T1 level, it was not anatomically impinging on either the spinal cord or the exiting nerve roots. He stated he did not utilize the discography procedure, characterizing it as a fringe or borderline procedure. He also explained that a number of doctors have abandoned the use of cervical discography because the test produces too many abnormal results.
Dr. Charles M. Aprill, another radiologist, testified that cervical discography is a helpful test for diagnosing disc problems, and that in Mrs. Cooper's case, the procedure had been properly performed. Dr. Aprill explained *1037 that Mrs. Cooper had three abnormal discs and that the discography helped to determine which disc was causing her pain.

ANALYSIS

Defense Counsel's Comments during Opening and Closing Arguments
Plaintiff urges the jury's verdict was influenced by prejudicial and inflammatory statements made by defense counsel during the trial, asserting defense counsel engaged in a "studied plan" to inflame the jury. On appeal, plaintiff objects to comments made by defense counsel during his opening argument: 1) regarding the Coopers having solicited legal advice before Mrs. Cooper sought medical treatment, 2) concerning Mrs. Cooper having been referred to Dr. Altman by her attorney, 3) referring to numerous other clients of plaintiff's counsel having been treated by Dr. Phillips, 4) suggesting that Dr. Phillips wrote a letter to plaintiff's counsel regarding Mrs. Cooper's ulnar neuritis having been caused by trauma when she "banged her elbow" during the automobile accident in order to take care of his "steady client,"[2] 5) characterizing Dr. Phillips and Dr. Altman as "hired guns" and "gunslingers,"[3] 6) indicating the bills of Dr. Altman's patients are guaranteed by plaintiff's counsel, and when they do not improve they are ultimately referred to Dr. Phillips who eventually performs surgery, and 7) stating that if a patient undergoes the discography procedure, it is because he is a plaintiff in a personal injury suit.[4]
On appeal, plaintiff also objects to statements made by defense counsel during closing arguments: 1) regarding Mrs. Cooper having ended up in "the hands of Dr. Phillips where most of Dr. Altman's patients end up,"[5] 2) commenting on Dr. Phillips having seen one hundred thirty-nine patients referred by plaintiff's counsel during a three year period,[6] 3) referring to Dr. Phillips as a "jukebox expert" and stating that Dr. Aprill could do "a pretty good duet with Dr Phillips,"[7] 4) stating that Dr. Phillips performed the more expensive neck surgery before Mrs. Cooper underwent the arm surgery so that he could put more dollars in his pocket,[8] 5) referring to Dr. Shansnia as "the doctor from *1038 Iran," and 6) questioning whether the Coopers' conduct of having purchased a yacht two months before Mrs. Cooper underwent her neck surgery when she was "emotionally and physically a wreck" was consistent with someone who was experiencing real pain. Plaintiff asserts the trial judge failed to admonish the jury to disregard inappropriate comments made by defense counsel.
Louisiana Code of Civil Procedure article 1631 provides, in pertinent part, as follows:
A. The court has the power to require that the proceedings shall be conducted with dignity and in an orderly ... manner, and to control the proceedings at the trial, so that justice is done.
* * * * * *
C. The court on its own motion, or on the motion of any party, after hearing, may grant a mistrial.
Litigants are entitled to a fair trial on the merits of the case not influenced by appeals to passion and prejudice. Counsel should limit their arguments to the evidence admitted and the inferences that may be properly drawn from it. Ogletree v. Willis-Knighton Memorial Hosp., 530 So.2d 1175, 1181 (La.App. 2d Cir.), writ denied, 532 So.2d 133 (La.1988). In Temple v. Liberty Mutual Ins. Co., 316 So.2d 783 (La.App. 1st Cir.1975), rev'd in part on other grounds, 330 So.2d 891 (La.1976), this court explained:
... The test of whether argument of counsel is prejudicial or inflammatory is whether such comment is unreasonable or unfair in the eyes of the law. When the language used is such as discloses a studied purpose to arouse the prejudices of the jury based on facts not in the case, the court cannot overlook it or consider that a party against whom such effort has been made has had a fair consideration of its case at the hands of the jury.
316 So.2d at 793 (quoting 88 C.J.S. Verbo Trial § 187, pp. 371-373).
This test is balanced against the well-settled jurisprudence that counsel has great latitude in argument before a jury. This latitude is subject to regulation and control by the court who has a duty to confine argument within proper bounds. Temple v. Liberty Mutual Ins. Co., 330 So.2d at 894. (Emphasis added.) The trial judge is vested with broad discretion in conducting trials in a manner which he determines will be conducive to justice. Jordan v. Intercontinental Bulktank Corp., 621 So.2d 1141, 1150-1151 (La.App. 1st Cir.), writs denied, 623 So.2d 1335, 1336 (La.1993), cert. denied, 510 U.S. 1094, 114 S.Ct. 926, 127 L.Ed.2d 219 (1994).
In the present case, plaintiff's counsel failed to object to any of these comments during the trial. His failure to object constitutes a waiver of the right to complain regarding the argument on appeal. Temple v. Liberty Mutual Ins. Co., 330 So.2d at 894; Ogletree v. Willis-Knighton Memorial Hosp., 530 So.2d at 1181; Brumfield v. Brumfield, 477 So.2d 1161, 1169 (La.App. 1st Cir.), writ denied, 479 So.2d 922 (La.1985). Moreover, the allegedly objectionable statements were subject to corrective measures. The court instructed the jury prior to opening arguments and after closing arguments that the statements of counsel were not evidence. The court further instructed the jury that their determinations were to be based solely on evidence and not upon the statements or suggestions of the attorneys. These instructions served to counteract any possible adverse effects of defense counsel's argument.
We also note the trial court denied plaintiff's motion for a new trial, in which plaintiff urged that the jury's verdict was influenced by prejudicial and inflammatory statements made by defense counsel. We find the trial court is in a better position than an appellate court to determine the possible prejudicial effects resulting from counsel's argument before a jury. The court's refusal to grant a new trial should therefore be accorded great weight. Temple v. Liberty Mutual Ins. Co., 330 So.2d at 894; Ogletree v. Willis-Knighton Memorial Hosp., 530 So.2d at 1181.
Based on the fact that no objections were raised at the time defense counsel made the comments, and due to the trial court's instructions which served as a corrective measure, we find no reversible error. While we strongly believe that the trial court *1039 should have taken steps to more actively control the behavior of counsel, we are not convinced that its failure to do so actually created a prejudicial effect sufficient to warrant interdiction of the jury's verdict.
Although the record does not provide a basis for a de novo review of the evidence, we feel compelled to point out that some of the comments made by defense counsel appear to be unprofessional. We take this opportunity to remind all counsel that as attorneys and officers of the court, they are required to "conduct [themselves] at all times with decorum, and in a manner consistent with the dignity and authority of the court and the role which [they] should play in the administration of justice." La. C.C.P. art. 371. This article also mandates that attorneys treat the court, witnesses, opposing party, and opposing counsel with due respect.[9] (Emphasis added.) The legal profession demands integrity, professionalism and a strict adherence to the rules of propriety. Although attorneys should zealously represent their clients' interests, we believe in this instance defense counsel stepped precariously close to the line which separates zealous representation from unprofessional conduct.

Defense Counsel's Questioning and the Admission of Evidence Regarding the Coopers' Ownership of Various Boats
Mrs. Cooper also complains the jury was improperly influenced and prejudiced by the admission of irrelevant evidence. In particular, Mrs. Cooper complains about defense counsel's cross-examination of her and her husband regarding their purchases and use of a "party boat" and a yacht. The following pertinent colloquy took place during defense counsel's cross-examination of Mr. Cooper during the trial on January 30, 1996:
Q.... Now, when was it that your wife had the slip and fall accident on that party boat that you bought?
A. Last summer.
Q. That was the one I think you paid 29,000 for that boat?
BY [counsel for plaintiff]:
Your Honor, this is totally absolutely unquestionably unnecessary. But to put prejudice and inflame the jury as to what the price of a party boat may have been that my client might have bought that his wife undeniably slipped and fell on.
BY THE COURT:
I sustain your objection.
BY [counsel for plaintiff]:
Thank you.
EXAMINATION BY [DEFENSE COUNSEL]:
Q. When Mrs. Cooper fell on that boat, you were concerned that she might be hurt?
A. Sure.
Q. And you went to the emergency room with her, didn't you?
A. Yes.
Q. You didn't go see an attorney first, did you?
A. No.
Q. Before your wife had her neck surgery back in July of '94 is when she had that surgery. Before that time you purchased another boat, didn't you?
A. Yes.
Q. A yacht, a Carver yacht?
A. If you want to call it that.
Q. How long did you have that boat before your wife's surgery?
A. I don't remember. Quite awhile.
* * * * * *
Q. In your deposition you say you purchased it in May of '94?
A. Okay. That's two summers ago. Okay.
Q. All right. Now, your wife would go out on the boat with you, wouldn't she?
A. Not much.
Q. You bought it to go fishing with your fishing buddies?
A. Right.
Q. But your wife made eight or nine trips out on the boat with you, right?

*1040 A. If that many. That's tops. I don't think she did.
* * * * * *
Q. And you sold that boat about a year later?
A. Yes.
Q. And shortly thereafter that you bought the next boat?
A. Right. I sold the original boat because she couldn't climb the ladder.
* * * * * *
Q.... Well, how much did you pay for that boat?
A. 40,000.
Q. Put a little money in it, fixed it up?
A. About six.
Q. And then you sold it for what you paid for it?
A. 48. 48.
* * * * * *
Q.... You made how many trips on that boat to the Broadwater Beach in the approximate year that you owned it?
A. Three. I don't remember.
Q. Okay. And when you made those trips, your wife went with you?
A. Sometimes she went, sometimes she met me there.
Q. Is that a picture of the Carver yacht that you sold for $48,000?
A. Yes.
By [defense counsel]:
I'm going to offer, file, and introduce this as Defense Exhibit-2.
By [plaintiff's counsel]:
Your Honor, I see no relevance to offer it into evidence. The man testified about the ladder. To put the picture of the boat in here again is strictly inflammatory and appealing to the jury to discriminate against my clients. Totally irrelevant.
By [defense counsel]:
I want the jury to be able to look at this boat and see about the ladder that he's talking about.
By [plaintiff's counsel]:
Your Honor, he wants the jury to see that he's got a 30 plus boat so you can use that as discrimination against my client. It is absolutely irrelevant to this case how big or how little that boat is or anything about the boat.
Following this exchange, the trial court sustained the objection but allowed the photograph to be proffered into evidence.
During Mrs. Cooper's cross-examination, defense counsel inquired about Mrs. Cooper's activities after the automobile accident and prior to her first surgery. She testified that she took a five-week trip in a motor home during the early part of 1995. Defense counsel also inquired regarding whether she had spent time on the yacht that her husband had purchased during May of 1994. At this point, plaintiff's counsel objected stating, "... here we go again doing nothing but just putting totally irrelevant stuff and trying to prejudice the jury about a yacht. I object to that line of questioning." At this point, the trial court responded, "I will overrule the objection. Let's continue with our wasteful efforts and waste of time." The court allowed further questioning regarding the number of times that Mrs. Cooper had gone out on the boat. Mrs. Cooper testified that she had been on the boat a few times and did not recall her earlier deposition testimony regarding the number of times she had been on the boat. Defense counsel stipulated she previously testified that she had gone out on the boat eight or nine times in the approximate year that Mr. Cooper owned the boat.
Generally, all relevant evidence is admissible. La. C.E. art. 402. Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 401. However, La. C.E. art. 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. The use of the term "may" in this article emphasizes the discretionary contextual character of an article 403 determination. Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544, 92-1545 p. 11 *1041 (La.App. 1st Cir. 3/11/94); 634 So.2d 466, 476, writ denied, 94-0906 (La.6/17/94); 638 So.2d 1094. Thus, broad discretion should be afforded to the trial judge to effect this balancing test. Whether evidence is relevant is within the discretion of the trial court and that ruling will not be disturbed by an appellate court in the absence of a clear abuse of discretion. Satterly v. Louisiana Indemnity Co., 97-655, p. 4 (La.App. 3d Cir. 12/10/97); 704 So.2d 882, 885, writs denied, 98-0081, 98-0113 (La.3/13/98); 713 So.2d 470, 474.
The law is clear that to preserve the right to appeal an erroneous trial court ruling which admits evidence, a party must make a timely objection and state the specific ground of objection. La. C.E. art. 103A(1); Bourg v. Bourg, 96-2422, p. 5 (La.App. 1st Cir. 11/7/97); 701 So.2d 1378, 1381. The reasons for the objection must be sufficiently brought to the attention of the trial court to allow it the opportunity to make the proper ruling and prevent or cure any error. See Jeansonne v. Bosworth, 601 So.2d 739, 744 (La. App. 1st Cir.1992), writ not considered, 614 So.2d 75 (La.1993).
After carefully reviewing the entire record, and particularly considering the above-referenced testimony, we find no abuse of discretion in the trial court's evidentiary rulings. Mrs. Cooper's suit includes a claim for damages for loss of enjoyment of life. She and Mr. Cooper testified that the accident has caused her pain and caused her to significantly curtail her activities. Thus, because defense counsel was attempting to establish that Mrs. Cooper's injuries did not preclude her from being able to enjoy boating activities around the time she underwent her neck surgery, we find the evidence regarding Mrs. Cooper's activities on the boats to be relevant. Although we agree that the price Mr. Cooper paid for the respective boats was not relevant to the issues before the court, we note the court did sustain the only specific objection made by plaintiff's counsel regarding the price of one of the boats. The court also sustained plaintiff counsel's objection to the introduction of the photograph of the yacht. Considering the record as a whole and the claims advanced by plaintiff, we find the evidence admitted regarding the Coopers' boats did not result in unfair prejudice, confuse the issues presented at trial or mislead the jury.

Causation
Mrs. Cooper claims the jury erred in failing to apply the presumption of causation established in Housley v. Cerise, 579 So.2d 973 (La.1991), and in finding she failed to carry her burden of proof regarding causation. In Housley v. Cerise, 579 So.2d at 980 (quoting Lucas v. Insurance Company of North America, 342 So.2d 591 (La.1977)), the court applied the following presumption:
[a] claimant's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.
This presumption is rebuttable, and the causal link can be broken if the opposition successfully rebuts plaintiff's evidence. Moran v. Harris, 93-2226, p. 4 (La.App. 1st Cir. 11/10/94); 645 So.2d 1244, 1246, writ denied, 94-3046 (La.2/17/95); 650 So.2d 253. The issue of whether plaintiff is entitled to the benefit of this presumption is factual and is subject to the manifest error standard of review. Lacy v. ABC Ins. Co., 97-1182, p. 6 (La.App. 4 Cir. 4/08/98); 712 So.2d 189, 193. If the jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Consequently, when there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Housley v. Cerise, 579 So.2d at 976.
Considering the evidence regarding Mrs. Cooper's medical condition prior to the automobile accident, we find the jury may well have concluded that Mrs. Cooper was not in good health prior to the accident and, thus, was not entitled to benefit from the presumption that her disability resulted from *1042 the accident. The testimony of Dr. Laborde and Dr. Scullin and the records regarding her medical treatment during 1984 and 1989 support such a finding. The medical evidence establishes that Mrs. Cooper suffered from neck pain, experienced numbness in her hands, and had been diagnosed with cervical spine disease prior to the accident. Therefore, if the jury concluded that Mrs. Cooper was not in good health prior to the accident, we find no manifest error in that determination.
On the other hand, the jury may have applied the Housley presumption and concluded the evidence set forth by defendant was sufficient to rebut the causal presumption. We, likewise, cannot say that such a finding by the jury is manifestly erroneous. Based on the diagnostic testing performed prior to and after the accident, Dr. Laborde found the condition of Mrs. Cooper's cervical spine in 1994 to be consistent with what it was in 1984. He stated the testing performed after the accident did not reveal herniation or fracture of the cervical discs and that the changes which were present were consistent with the aging process. Dr. Laborde testified that the degenerative changes in Mrs. Cooper's neck were preexisting conditions and that the condition of Mrs. Cooper's cervical spine was not attributable to any type of trauma or accident. In his opinion, neck surgery was not necessary. Dr. Laborde also believed Mrs. Cooper's ulnar neuropathy existed prior to the 1993 accident. He opined that this condition developed slowly over the years and was probably not caused by trauma. Dr. Scullin also agreed that the diagnostic testing performed during 1984, 1989 and 1993 described degenerative changes in the spine. He also found no evidence of a C5-6 level herniation. We find this medical evidence sufficient to support a finding by the jury that the accident did not cause plaintiff's medical problems. We find no error in the jury's conclusion that the May 3, 1993 car accident was not the cause of Mrs. Cooper's injuries.

CONCLUSION
For the above reasons, we affirm the judgment of the trial court. The costs of this appeal are to be paid by plaintiff-appellant, Mrs. Rose S. Cooper.
AFFIRMED.
FOIL, J., concurs in the result.
NOTES
[1] Mr. Harvey J. Cooper, Jr., Rose's husband, was also initially named as a plaintiff in this suit but his claims were voluntarily dismissed prior to trial. The Coopers also asserted claims against Richard Shawver and Catherine Abraham, the other drivers involved in the automobile accident, and their respective insurers. These claims were also dismissed before trial and are not at issue in this appeal. The parties stipulated that the Coopers' claims against Shawver and his liability insurance, United Southern Insurance Company ("USIC"), were dismissed after releases were executed in favor of Shawver and USIC in exchange for payments of $10,000.00 to Mrs. Cooper and $8,000.00 to Mr. Cooper. During trial, the parties stipulated that Shawver was negligent and one hundred percent at fault in causing the accident and that Mrs. Cooper was free from fault.
[2] During his opening statement, defense counsel stated, "You might ask yourself why, why did Dr. Phillips write this letter? Here's the explanation for that: Because he got a telephone message from [counsel for plaintiff] a couple days before.... And Dr. Phillips, ever mindful of taking care of his steady client, generated this letter, she banged the elbow." Dr. Phillips testified that at the request of plaintiff's counsel, he furnished a letter dated December 7, 1994, which addressed the cause of Mrs. Cooper's ulnar neuropathy.
[3] During his argument, defense counsel stated, "And Mr. Hingle sent her to Dr. Altman who spends about 95 percent of his time seeing patients or seeing plaintiffs in personal injury lawsuits and worker compensation suits. Someone used the phrase before `hired gun .' Well, let me tell you, Dr. Altman is a gun slinger with the best of them. But he's not better than the ultimate gun slinger, who is Dr. Stuart Phillips."
[4] Defense counsel commented, "You won't find a lot of people doing discography. The ones that you do find doing it are plaintiff personal injury lawyers. Chances are if you're getting discography, it's because you're a plaintiff in a personal injury lawsuit."
[5] Defense counsel stated, "[Mrs. Cooper] didn't get better, so she gets in the hands of Dr. Phillips where most of Dr. Altman's patients end up."
[6] In a supplemental response to deposition upon written questions, Dr. Phillips' clinic, the New Orleans Orthopaedic Clinic, stated that during the years 1993 through 1995, plaintiff counsel's firm, Michael Hingle and Associates, was a guarantor for one hundred thirty-nine patients referred to the clinic.
[7] Defense counsel commented, "Now do you know what we call Dr. Phillips in our profession? We call him a jukebox expert. You drop a few quarters in, you push a button, he'll sing any song you want. That's what Dr. Phillips is, and that right there proves it. Now one thing I learned today was that Dr. Aprill could do a pretty good duet with him, too."
[8] Defense counsel stated, "But you've seen Dr. Phillips. He makes his decision, he's going to do the neck surgery. Okay? And it's obvious how much more complicated and how much more expensive that neck surgery is than the arm surgery.... Dr. Phillips wants to do the neck surgery first. Why? Agreed. Money. That's why. He'll operate on his own mother if it'll put more dollars in his pocket, and he's been doing it for years."
[9] Louisiana Code of Civil Procedure article 371 further provides that the attorney at law subjects himself to punishment for contempt of court, and such further disciplinary action as is otherwise provided by law.